[S.F. No. 23495. Feb. 28, 1979.]

SOUTHERN CALIFORNIA GAS COMPANY, Petitioner, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
CITY OF LOS ANGELES, Real Party in Interest.

**COUNSEL**

William M. Pfeiffer, Thomas D. Clarke, David B. Follett, Lawrence M. Stone, Irell & Manella, Richard H. Borow, Susan I. Spivak and Francis J. Mirabello for Petitioner.

Richard D. Gravelle, J. Calvin Simpson, John S. Fick, Janice E. Kerr, Hector Anninos and Walter H. Kessenick for Respondents.

Burt Pines, City Attorney, Thomas C. Bonaventura, Assistant City Attorney, and Leonard L. Snaider, Deputy City Attorney, for Real Party in Interest.

**OPINION**

**BIRD, C. J.**—Petitioner, Southern California Gas Company (SoCal), seeks review of two decisions of the Public Utilities Commission lowering its authorized rate of return. This court must decide whether the commission's decisions are supported by the evidence.

I

This case is but the latest round in a complex and ongoing clash of philosophies regarding the taxation of regulated public utilities. That clash has involved the United States Congress, the major utilities of this state, our Public Utilities Commission, the state's largest cities, and consumer groups. A brief historical analysis is helpful to place the present case in perspective.

This case involves the manner in which the investment tax credit is to be treated in setting the rates of a regulated public utility. Rates of a publicly regulated utility are based on two components: (1) the utility's operating expenses (cost of service), and (2) a fair return on its investment, which is found by multiplying its authorized rate of return by the value of property devoted to public use (rate base). (See *City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798] [hereafter *City of San Francisco*].) As taxes are part of a utility's cost of service, this expense is borne by the ratepayers.

Congress enacted both the accelerated depreciation deduction and the investment tax credit as a means of stimulating industrial plant expansion.[1] Both involve accounting procedures which enable an enterprise to

---

[1] Since 1954, businesses, including utilities, have been permitted to take deductions on depreciable capital assets as if the asset depreciated more rapidly during the early years of its useful life. In an expanding enterprise new assets are constantly being acquired. As each asset "uses up" its depreciation deductions, new assets provide large new deductions. In this way a portion of the enterprise's taxes are deferred indefinitely. (See *City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 685-687 [125 Cal.Rptr. 779, 542 P.2d 1371].) Allowing businesses to use accelerated depreciation deductions for new capital

save a portion of its income taxes when it invests in new plants. In providing both the accelerated depreciation deduction and the investment tax credit, Congress also provided optional ways in which these savings could be treated for ratemaking purposes. The Internal Revenue Code sets forth three methods to be used by utilities to pass the savings generated by the investment tax credit to their ratepayers. (Int. Rev. Code, § 46(f)(1), (2), (3).)[2] The first option, not at issue in this case, allows the utility to reduce its rate base by the amount of the credit and to restore that amount to its rate base proportionately over the useful life of the property acquired through the investment. The second method, called "ratable flow-through," allows the tax savings to be subtracted from the utility's cost of service proportionately, or "ratably," over the useful life of the property. Thus the tax savings, in the form of reduced rates, are spread throughout the useful life of the property, and all ratepayers who have the benefit of the property share in the savings. The third option, called "immediate flow-through," reduces the cost of service or the utility's rate base in the year of the tax savings by the full amount of the savings. Under this option, it is the present ratepayers who reap the full benefit of the tax savings. This is based on the theory that ratepayers should not have to pay the utility for costs it does not actually incur. However, if the savings are "flowed through" fully and immediately, the utility loses most of the benefit of the savings.

Naturally, utilities have generally favored option two since it allows the utility to retain the lion's share of the tax savings in the first year to offset its investment costs. The cities, consumers and the commission have generally taken the position that rates charged to customers of publicly regulated monopoly utilities should reflect only actual costs incurred. As taxes are treated as part of a utility's cost of service, any tax savings should not be retained by the utility but should be immediately passed on to the utility's customers. Accordingly, since 1960 the commission has required utilities to charge as operating expenses only the amount of

equipment thus provides an incentive for capital investment. The investment credit permits a specified percentage of the cost of new capital investments to be credited against current tax liability. As a result, it acts as a stimulus to new investment. Both tax measures are self-executing and largely invisible ways to allocate resources for utility expansion because neither program requires a separate appropriation or a new bureaucracy.

[2]The treatment of the savings generated by accelerated depreciation is not an issue in the present case. However, utilities using accelerated depreciation have similar options: immediate flow-through and "normalization," a procedure similar in effect to "ratable flow-through" of the investment tax credit. (Int. Rev. Code, § 167(1); see *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 338-339 [102 Cal.Rptr. 313, 497 P.2d 785].)

taxes actually paid.[3] Any savings acquired through the use of accelerated depreciation or the investment tax credit is to be immediately flowed through to the ratepayers. (*Commission Investigation Regarding Rate Fixing Treatment for Accelerated Amortization and Depreciation for All Utilities* (1960) 57 Cal.P.U.C. 598 [hereafter *Commission Investigation*]; *Pac. Southwest Airlines* (1972) 73 Cal.P.U.C. 697, 708-710.)

The difference between the commission's policy and the utilities' position is thus clear. From the utilities' standpoint, the investment tax credit for public utilities amounts to a federally subsidized source of interest-free capital over and above the return allowed by the state regulatory agency. The utility is expected to invest its tax savings in capital equipment and "repay" it, in the form of reduced rates, ratably over the life of the investment. From the commission's standpoint, however, the tax credit is like any other reduction in the cost of service, the benefit of which the commission is required by California law to pass on to the ratepayers as fully and immediately as possible. (*Commission Investigation, supra,* 57 Cal.P.U.C. at p. 602.) Insofar as present ratepayers are charged on the basis of taxes the utility does not actually pay, it is they and not the federal government who supply the additional capital for utility expansion, even though the savings may be eventually flowed through ratably to future ratepayers.[4]

■ This court has endorsed the commission's position: " 'The basic principle [of ratemaking] is to establish a rate which will permit the utility to recover its cost and expenses *plus* a reasonable return on the value of property devoted to public use.' (Italics added.) (*City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798].) It is thus elementary regulatory law that the 'return'—i.e., the profit—of the utility is calculated solely on the rate base—i.e., the capital contributed by its investors; the utility is not entitled to earn an additional profit on its expenses, but only to 'recover' them on a dollar-for-dollar basis as part of the rates." (*Southern Cal. Edison Co.* v. *Public Utilities Com.* (1978) 20 Cal.3d 813, 818-819 [144

[3]In practice the commission permits the utilities to flow the savings through on a five-year-average basis to provide more even rates.

[4]At present tax rates, in order to maintain the utility's after-tax rate of return on investment at a constant level, the utility must earn in gross revenue approximately $2 for every $1 it pays in taxes. Thus, a tax savings of $1 million would permit gross revenues (the income from the rates charged customers) to fall by roughly $2 million without affecting net return. However, if the savings are not passed on to the ratepayers, the ratepayers supply twice as much in capital as the utility saves in taxes. Although under ratable flow-through the entire $1 million would be flowed through in equal installments over 39 years, the utility receives the use of that money prior to repayment.

Cal.Rptr. 905, 576 P.2d 945].) Permitting rates to be set on the basis of taxes the utility has not actually paid, this court has reasoned, in effect forces the ratepayers to contribute capital to be used for utility expansion. (See *City of Los Angeles* v. *Public Utilities Commission, supra,* at pp. 685-687 [hereafter *City of Los Angeles*]; *City of San Francisco, supra,* 6 Cal.3d at pp. 128-129.)

This court upheld the commission's policy of requiring immediate flow-through of tax benefits in *City of San Francisco, supra,* 6 Cal.3d 119, annulling a commission decision that failed to consider available alternatives for passing tax savings realized through use of accelerated depreciation on to customers. Similarly, in *City of Los Angeles, supra,* 15 Cal.3d 680, this court treated the tax savings realized through the investment credit in the same manner as the savings realized through use of accelerated depreciation (*id.,* at p. 685, fn. 3), and directed the commission to use any means legally at its disposal, including adjustment of rate of return, to insure that the savings were passed to the customers. (*Id.,* at pp. 685 and 704-705, fn. 42.)

The Revenue Act of 1971 allowed utilities a credit against current tax liability of 4 percent of any qualified investment in "distribution" property and 7 percent of any qualified investment in "transmission" property. (Rev. Act of 1971, § 105, 85 Stat. 497, 503-506, amending Int. Rev. Code, § 46.) The Tax Reduction Act of 1975 increased the investment credit for utilities to 10 percent for both "transmission" and "distribution" property. (89 Stat. 26, 36, amending Int. Rev. Code, § 46.) The 1975 act also specified three options available to utilities in treating the credit for ratemaking purposes.[5] However, the 1975 act provided that the choice of immediate flow-through was to be made only at the utility's "own option, and without regard to any requirement imposed by" a state regulatory commission. (Int. Rev. Code, § 46(f)(8).) If the utility elected ratable, instead of immediate, flow-through, and the regulatory commission adjusted either the utility's cost of service or its rate base to flow through the credit faster than ratably, the credit would not be allowed.[6]

[5]The election among all three options (discussed *ante,* at pp. 474-475) was available only to those utilities, such as SoCal, which had previously made an election under section 46(f)(3) of the Internal Revenue Code for immediate flow-through treatment of the investment tax credit provided by section 105 of the Revenue Act of 1971. (Int. Rev. Code, § 46(f)(8).) The Tax Reduction Act of 1975 left the prior election in effect but provided an additional investment tax credit that is the subject of this case. (See 26 C.F.R. § 9.1 (1978).)

[6]Internal Revenue Code section 46(f)(2) states: "If the taxpayer makes an election under this paragraph ... , no credit shall be allowed by section 38 ... .—

"(A) Cost of service reduction.—If the taxpayer's cost of service for ratemaking

However, the act does not provide for disallowance of the credit if the utility's rate of return is adjusted to compensate for benefits accruing from the tax credit.

In May 1975, the commission began an investigation into the implications of the increase in the investment credit. SoCal and other utilities were asked to submit to the commission figures showing the revenue impact of the investment credit. They were invited to brief the question of proper treatment of the credit, and the commission held a hearing. Initially, several utilities, most of whom had not yet elected among the three options, objected to the commission investigating the question at all. There was some fear that the Internal Revenue Service might interpret any recommendation of immediate flow-through by the commission as coercive under Internal Revenue Code section 46(f)(8), thus leading to the forfeiture of the credit. Nevertheless, SoCal testified at the hearing that the capital potentially available as a result of the tax credit was but a small fraction of the company's capital needs, estimated at $750 million annually. SoCal further indicated that pursuant to previous commission mandates, it intended to flow through immediately the full 10 percent realized on transmission properties and the original 4 percent allowed on distribution properties. However, the company planned to choose option two for the additional 6 percent on distribution properties. SoCal estimated its tax savings from the increase in the investment credit on distribution properties to be $2,060,000 in 1975 and $3.27 million in 1976. By flowing the tax savings through ratably over a 39-year period, SoCal would initially retain most of these savings and would reduce the revenue required from the ratepayers by $114,000 in 1975 and $295,000 in 1976. However, if the savings were immediately flowed through to the ratepayers, required revenue would be reduced by $4,426,000 in 1975 and $7,026,000 in 1976. Rates could be reduced accordingly. (See fn. 4, *ante.*)

On June 17, 1975, the commission discontinued its investigation of the investment credit since it was unable to agree on a result. Two commissioners filed a concurrence stating that the choice of option one or option two would constitute managerial imprudence. Although the commission could not dictate a utility's choice of accounting procedures, these commissioners felt bound to adjust the rates to disallow the effects

purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or

"(B) Rate base reduction.—If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection)."

SoCal representatives admitted that the president of its parent corporation, Pacific Lighting Corporation, advocated this forfeiture provision before the Congress.

of the imprudent choice to protect the utility's customers. Ten days later, SoCal notified the Internal Revenue Service that it had chosen option two, ratable flow-through.

The present case had its genesis in SoCal's application No. 55544 to the commission for a rate increase of $80,221,000 per year to offset increases in the cost of natural gas.[7] An interim increase was granted on April 1, 1975. Congress had just passed the Tax Reduction Act of 1975 increasing the investment credit, but SoCal had not decided which option it would elect to flow through the tax benefits to customers. Several parties, including the City of Los Angeles, pointed out that expedited procedures had been devised to grant the utilities rate relief whenever fuel costs went up. They argued that similar action should be taken in an offset proceeding, when there was an extraordinary *decline* in the utility's costs—such as a significant reduction in taxes. The commission postponed consideration of this point, making the interim rate increase subject to refund.

On April 23, 1975, SoCal filed application No. 55676, another offset proceeding, to increase rates by $40,741,000 in view of increased gas costs. Interim relief was granted by the commission on June 17, 1975, raising SoCal's rates by $31,339,000, subject to refund when the commission concluded its pending study of the investment credit.

Hearings resumed in that offset proceeding in July. SoCal objected to any questions regarding the financial impact of the tax credit, on the grounds that the commission was separately investigating that issue and that any decision should be made in SoCal's general rate case. The objections were overruled and some testimony was taken from SoCal's witnesses on that question. At the same time, hearings were held in SoCal's general rate case, application No. 55345. Extensive testimony was received concerning the impact of the investment tax credit in those hearings.[8]

On September 22, 1975, the hearing examiner in No. 55676 set dates for receipt of briefs on the investment credit issue and stated that hearings tentatively scheduled for November 3 through 6 would be

---

[7]A procedure has been devised, called a "purchased gas adjustment" or "fuel cost adjustment," whereby utilities can receive expedited rate increases to offset rapidly fluctuating fuel supply costs. All other factors, including rate of return, are held constant, and only the extraordinary expense item is considered. (Cf. *Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d 813.)

[8]The commission ultimately raised SoCal's rate of return to 8.8 percent in that case. (*Southern California Gas Company* (1976) 80 Cal.P.U.C. 636.)

cancelled "unless any party submitting a brief specifically requests oral argument therein." On November 3, 1975, a hearing was convened. The hearing examiner stated that he inferred from SoCal's brief that it might wish further hearings. SoCal, which had not been represented at the November 3 hearing, responded by letter that it did not. On November 24, 1975, the examiner cancelled additional hearings and incorporated into the record relevant parts of the hearings in SoCal's general rate case and the commission's investigation of the tax credit.

On March 30, 1976, in Decision No. 85627 in the offset proceeding (application No. 55676), the commission found that the benefits provided by the Tax Reduction Act of 1975 justified reducing SoCal's authorized rate of return by .25 percent. Appropriate refunds were ordered. Two commissioners dissented. (79 Cal.P.U.C. 674.)

The City of Los Angeles and SoCal both petitioned the commission for a rehearing. In Decision No. 86117, the commission denied the rehearing and affirmed its previous reduction in SoCal's rate of return. (80 Cal.P.U.C. 235.) Modifications were made in both the findings of fact and conclusions of law to make the commission's position more explicit. SoCal petitioned this court for a writ of review as to both orders, and the commission stayed its orders at SoCal's request.

## II

█ SoCal contends the commission's decision to reduce its rate of return is wholly unsupported by the evidence in the record. SoCal further argues that the decision is an indirect attempt to force it to flow through the tax credit immediately, which in turn will cause the Internal Revenue Service to disallow the credit. They argue that because the refund order is based on the false assumption that SoCal *will* receive benefits from the tax credit, it is unreasonable.

█ The setting of utility rates and rates of return is a legislative act, delegated by the Legislature to the Public Utilities Commission. (*Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 647 [44 Cal.Rptr. 1, 401 P.2d 353] [hereafter *Pacific Tel. & Tel.*].) As with any legislative act, the commission's findings and conclusions on matters of fact are final and its decisions are presumed to be valid. Review by this court is limited to determining whether the commission's decisions are supported by the evidence and whether the utility has been afforded due process. (*American Toll Bridge Co.* v. *Railroad Com.* (1938) 12 Cal.2d 184,

190-193 [83 P.2d 1]; *Pacific Tel. & Tel., supra,* 62 Cal.2d at pp. 646-647; Pub. Util. Code, § 1757.)[9] Accordingly, this court is authorized to determine only whether the commission's orders reducing SoCal's rate of return are supported by the evidence, and whether the commission correctly concluded that under its decision SoCal would remain eligible for the tax credit.

■ In its original order (No. 85627, 79 Cal.P.U.C. 674), the commission devoted six pages to a consideration of the investment tax credit. After summarizing the arguments presented, the decision cited statements from SoCal's brief regarding the benefits option two would bring the utility. The commission then noted, "We do, of course, have the continuing duty in line with The City of Los Angeles v. PUC [15 Cal.3d 680], S.F. No. 23215, decided December 12, 1975, to consider the effect of the utility's election on the risk characteristics of its securities and other financial conditions. [¶] It is our informed judgment that a rate of return adjustment downward of 0.25 percent will best recognize the reduction of risk claimed by SoCal in its choice of Option 2." (79 Cal.P.U.C. at p. 686.)

In Decision No. 86117, the commission denied a rehearing and affirmed its previous reduction in SoCal's authorized rate of return. "SoCal claims there is absolutely no evidence in the record concerning the issue of rate of return. As we noted at page 18 of Decision No. 85627, SoCal's brief in this matter sets forth the benefits of its election to use ratable flow-through. These benefits were described by SoCal witness Goodenow in Application No. 55345. ■■■■ He stated SoCal's cash flow would be maximized, its interest coverage increased,[10] and the

[9]Public Utilities Code section 1757 states: "No new or additional evidence may be introduced in the Supreme Court, but the cause shall be heard on the record of the commission as certified to by it. The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State.

"The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination."

Public Utilities Code section 1760 states: "In any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the Constitution of the United States, the Supreme Court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the constitutional question shall not be final."

[10]"Interest coverage" expresses a relationship between the amount of return devoted to debt capital costs, as opposed to the amount available to equity investors, and the rate of

financial requirements in constructing facilities and acquiring gas supplies relieved. [Citation.] **(2c)** Each of these benefits reduces SoCal's risk. It is our informed judgment that a downward reduction of 0.25 percent in SoCal's rate of return best recognizes the reduction in risk resulting from SoCal's exercise of Option 2 pursuant to the Tax Reduction Act of 1975." (Fn. omitted.)[11] Further, "[a] rate of return adjustment of 0.25 percent is in accord with *City of Los Angeles* v. *Pub. Util. Comm.,* 15 C.3d 680 (1975) and will not deprive SoCal of eligibility for the additional investment tax credit under the Tax Reduction Act of 1975."

The entire record of the commission's examination of the investment tax credit and all relevant testimony adduced at the hearings in SoCal's general rate case were incorporated in the record of this case. All witnesses agreed that election of ratable flow-through would improve SoCal's financial position. Several witnesses testified regarding the multifarious impact of the tax credit on SoCal's "business risk." For example, there was testimony that the increased capital would improve SoCal's pretax interest coverage from 2.96 to 3.01, a "major" change according to one SoCal witness. The improvement in interest coverage could lead to an improved bond rating and a corresponding decrease of as much as .5 percent in the amount of interest SoCal would have to pay on its contemplated $40 million bond issue. There was also testimony regarding the extent to which the tax credit would bring about a reduction in SoCal's fixed or "embedded" debt cost, which is the cost of obligations with fixed interest rates such as bonds and loans.

On the basis of this evidence, the commission concluded that the reduced business risk and improved financial position SoCal would enjoy warranted some reduction in SoCal's rate of return. While no witness testified that a rate of return reduction of .25 percent would exactly reflect the reduced business risk SoCal would enjoy as a result of the capital available from the tax credit, witnesses were repeatedly asked to quantify the financial impact of the credit. Most witnesses said the impact was difficult, if not impossible, to quantify, and described the impact of the credit only in terms of their particular area of expertise, such as interest coverage or bond ratings. These factors were not integrated into a single

return as a whole. It is usually used to express the ratio between rate of return and allowance for debt cost (interest). Interest coverage is a major indicator considered by securities analysts and bond rating services.

[11]Finding No. 5, as modified, provides: "A rate of return adjustment downward of 0.25 percent on an $824.5 million rate base will best recognize SoCal's reduction of risk because of increased cash flow, increased interest coverage, and relieved financial requirements resulting from the Tax Reduction Act of 1975."

figure by any of the witnesses.[12] However, pursuant to its statutory mandate as a policymaking body, the commission, based on its informed judgment, translated the extensive testimony regarding the impact of the tax savings into precise rates and rates of return. After a careful review, it is clear that there is evidence in the record to support the commission's findings.

In challenging the commission's decisions, SoCal must overcome the presumption that they are valid. (*Pacific Tel. & Tel., supra,* 62 Cal.2d at p. 647.) SoCal has not done so. SoCal has not shown that the commission's reduction was an unreasonable estimate of the collateral benefits SoCal claimed it would realize from tax credit, nor has it argued that the reduction would entirely eliminate those benefits. Indeed, SoCal has not suggested, either to the commission or to this court, what reduction would be a reasonable estimate of those benefits. Further, SoCal has not argued that the reduction in rate of return is unreasonable because it would result in a lower return on capital than that realized on comparable investments. (*Bluefield Co.* v. *Pub. Serv. Comm.* (1923) 262 U.S. 679, 692 [67 L.Ed. 1176, 1182, 43 S.Ct. 675].)[13]

Establishing a fair rate of return for a regulated utility is a difficult task, not subject to easy formulation. (See, e.g., 1 Priest, Principles of Public

[12]The relationship among these factors may be simplified as follows. The utility's profit, that is, rate of return times rate base, is allocated by the utility partly to return on equity capital (to shareholders as dividends) and partly to interest on debt capital. (See generally, 1 Priest, Principles of Public Utility Regulation (1969) pp. 208-210.) Lowering the rate of return obviously lowers the utility's overall profit. However, the increased capital available from the tax credit and the improvement in interest coverage to some extent decrease the amount of profit that must be allocated to debt capital costs. Thus, if the decrease in debt cost is sufficient, the reduction in rate of return need not result in a reduction in return to shareholders. Because of constant fluctuations in the capital markets, it is not possible to calculate a utility's debt cost precisely. Further, no witness precisely calculated the tax credit's impact on debt cost.

[13]The dissent argues that the reduction in the rate of return ordered by the commission was "inappropriate" because it reduces SoCal's revenue by approximately the amount SoCal has saved in taxes. Thus, after both of these adjustments, SoCal receives approximately the same revenue it received before Congress increased the investment credit. The dissent concludes that "[a]bsent some extra cash received or kept by the utility, there is no benefit to justify reduction in the rate of return. [Fn. omitted.]" (Dis. opn., *post,* at p. 489.)

While that argument is superficially appealing, the dissent overlooks the fact that the utility would realize an estimated reduction of over $2 million in its 1975 tax bill and over $3.2 million in its 1976 tax bill. Since SoCal's election of option two was not disturbed, SoCal's cost of service, and therefore rates, would continue to be calculated as if SoCal had not received this reduction. Thus SoCal would reap "extra cash" of over $2 million in 1975 and over $3.2 million in 1976. (See Int. Rev. Code, § 46(f)(8).) The commission could reasonably have concluded that a reduction in rate of return was warranted by this significant reduction in SoCal's tax bill and the benefits SoCal admitted this infusion of interest free capital would provide.

Utility Regulation, *supra,* at p. 196.)[14] The commission in this instance reduced SoCal's rate of return from 8.5 percent to 8.25 percent to reflect its improved capital position. The commission set forth the principles on which it made its decisions and stated findings of fact that are supported by evidence in the record, as mandated by Public Utilities Code section 1705. (*California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 273-275 [28 Cal.Rptr. 868, 379 P.2d 324].) SoCal has failed to show that the amount the commission fixed as a fair rate of return is clearly unreasonable. Accordingly, under long-standing principles of review, this court may not substitute its judgment for that of the commission. (*Pacific Tel. & Tel., supra,* 62 Cal.2d at p. 647; *Market St. Ry. Co.* v. *Railroad Com.* (1944) 24 Cal.2d 378, 397-399 [150 P.2d 196]; *City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d at p. 348.)

■ SoCal next argues that even if reasonable in the abstract, the commission's decisions are in fact unreasonable because they are based on the faulty premise that SoCal will remain eligible for the tax credit. SoCal argues that because the revenue impact of the reduction in rate of return so closely corresponds to the revenue reduction which would be produced by immediate flow-through of the tax credit, it must be viewed as an indirect attempt to force SoCal to flow through the tax benefits immediately. Since the commission has done indirectly what Congress forbids it to do directly, SoCal argues, the 6 percent additional investment credit on distribution property will be disallowed. (Int. Rev. Code, § 46(f)(2) and (4).) Hence, the benefits alleged to justify the reduction in rate of return will be eliminated. However, a close reading of section 46(f) of the Internal Revenue Code supports the commission's position.

Internal Revenue Code section 46(f)(2) states that if a regulatory agency adjusts either the rate base or the cost of service of a utility that elects ratable flow-through, in order to flow the credit through faster than ratably, the credit will be disallowed. However, the commission did not order SoCal to flow the tax savings through immediately. Rather, it reduced SoCal's rate of return to take into account its improved financial position. SoCal's election of option two has not been disturbed. (See Int. Rev. Code, § 46(f)(8).) While the Tax Reduction Act of 1975 states that the credit will be disallowed if cost of service or rate base is reduced to directly flow through the tax credit, nothing in the act indicates that the

---

[14]In this offset proceeding, *only* the impact of the tax credit on rate of return was considered. In SoCal's general rate case, all factors bearing on SoCal's operations were under review. In that case the commission raised SoCal's rate of return to 8.8 percent for 1976. (*Southern California Gas Company* (1976) 80 Cal.P.U.C. 636, 695-696.)

credit will be disallowed if the utility's *rate of return* is adjusted by a regulatory agency to compensate for collateral benefits accruing from a tax savings.[15]

Adjustments in these elements are not interchangeable. It is relatively easy to deduct the amount of the tax savings from a utility's cost of service or the utility's rate base, thus passing the entire savings immediately to the ratepayers. However, computing rate of return is a complex process involving a great many variables. Such a calculation is particularly within the expertise of regulatory commissions. In drafting section 46(f), Congress has apparently avoided constraining the power of a regulatory commission to adjust a utility's rate of return as the commission did.[16] Accordingly, sections 46(f)(2) and 46(f)(8) do not compel the disallowance of the tax credit.

SoCal calls this court's attention to a letter ruling issued to it by the Internal Revenue Service on November 19, 1976, subsequent to the commission's decision. The letter ruling states that the regulatory treatment of the investment credit proposed by the commission would result in disallowance of the credit. However, in issuing that ruling the Internal Revenue Service did not have access to the complete record in this case, nor did the commission present its arguments to the Internal Revenue Service. It is evident that the Internal Revenue Service accepted SoCal's allegation that there was no reasonable relationship between SoCal's reduced business risk and the reduction in rate of return, a conclusion which the record does not support. Further, at the time SoCal requested that ruling, it was not necessarily in its interest to persuade the Internal Revenue Service that the credit should be allowed. In fact, the City of Los Angeles, which filed comments with the Internal Revenue Service on SoCal's requested ruling, characterized SoCal's effort as less than whole-hearted. Such letter rulings are not final. They are subject to revocation or modification at any time (26 C.F.R. § 601.201(*l*)(1) and (4) (1978)), and are reviewed in determining a taxpayer's actual tax liability

[15]Indeed, subsequent to submission of this matter the Treasury Department issued new regulations clarifying section 46(f). They indicate that a reduction in rate of return "intended to achieve an effect similar to a direct reduction to cost of service or rate base" will be grounds for disallowing an investment tax credit. (26 C.F.R. § 1.46-6(b) (4) (iii) (1979).) However, an additional regulation allows for the consideration of a utility company's investment tax credit when examining its financial condition, "even though such condition, as affected by the rate-making treatment of the company's investment tax credits, is considered in the development of a reasonable rate of return on common shareholder's investment." (26 C.F.R. § 1.46-6(b) (4) (iv) (1979).)

[16]By contrast, a provision in the Revenue Act of 1964 on the treatment of a previous investment tax credit by *federal* regulatory agencies stated that "Congress does not intend that any agency or instrumentality of the United States having jurisdiction with respect to a taxpayer shall, without the consent of the taxpayer, use [the investment credit] to reduce

(26 C.F.R. § 601.201(*l*)(2)).[17] Accordingly, that letter ruling does not bind the Internal Revenue Service or this court. This court concludes that the commission has not acted in contravention of section 46(f)(2) of the Internal Revenue Code and has not influenced SoCal to abandon its election of ratable flow-through.[18]

## III

SoCal raises two further contentions. ■ SoCal first argues that it was denied due process of law because a hearing was held in these proceedings on November 3, 1975, in its absence and without affording it sufficient notice. The hearing examiner had previously stated that the hearings originally scheduled for November 3 through 6 would be cancelled unless any party requested otherwise in its brief. The examiner nonetheless caused an announcement of the hearing on November 3 to be published in the commission's daily calendar listings.

The hearing itself lasted 10 minutes. At the hearing the examiner noted that SoCal might wish further hearings. He and the staff counsel for the commission, however, agreed that the issue was primarily one of law, and that incorporating parts of the record in the commission's investigation and in SoCal's general rate case would obviate the need for further hearings. The hearing was adjourned. When SoCal received a transcript of the November 3 hearing, it notified the hearing examiner that it did not wish further hearings and that it agreed the issue was one of law.

SoCal's claim that it was denied due process is thus without merit. Nothing of substance transpired at the November 3 hearing, and SoCal expressly waived further hearings. SoCal was amply represented at all substantive hearings in the commission's investigation of the investment credit, the offset proceeding, and its own general rate case. Moreover, ample opportunity was provided to submit briefs on the issue.

---

such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer *or to accomplish a similar result by any other method.*" (Revenue Act of 1964, § 203(e), 78 Stat. 19, 35, italics added.)

[17]Letter rulings are issued by the National Office of the Internal Revenue Service in response to taxpayer requests. "A ruling . . . may be revoked or modified at any time in the wise administration of the tax statutes," and such actions are retroactive. (26 C.F.R. § 601.201(*l*)(1) (1978).) When a taxpayer actually files a return including items on which the ruling was requested, the Internal Revenue Service will determine whether the ruling has been appropriately applied, including a determination "whether the representations upon which the ruling was based reflected an accurate statement of the material facts . . . ." An initial decision that the ruling should be modified or revoked will be reviewed by the national office. (26 C.F.R. § 601.201(*l*)(2) (1978).)

[18]However, if the credit is eventually disallowed, thus increasing SoCal's tax liability, SoCal may petition the commission for appropriate relief.

█   SoCal further argues that although the refund orders were based on a reduction in its previously authorized rate of return from 8.5 percent to 8.25 percent, during the period involved the company was in fact earning only "7.93 percent, and significantly less when adjusted to average temperature conditions." However, SoCal cites no evidence in the record in support of this assertion.

The present case involves an offset proceeding. SoCal initially sought rate increases to cover increases in the cost of gas supplies. The commission granted interim rate increases, but made the additional revenue "subject to refund in whole or in part should the Commission determine that Southern California Gas Company has a reduced revenue requirement resulting from its investment tax credit election under the Tax Reduction Act of 1975." (*Southern California Gas Company* (1975) Cal. Pub. Util. Com., Dec. No. 84700, p. 2.) The commission later ordered refunds based on its reduction in SoCal's authorized rate of return. These refunds were far less than the amount of the rate increase.

SoCal appears to be arguing that the commission cannot order such refunds unless it has been established that SoCal had in fact been earning its previously authorized rate of return. In *Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d 813, this court rejected a similar argument, noting that the purpose of the expedited fuel cost adjustment procedure was to allow the utility to recoup its increased costs, not to ensure that its authorized rate of return was actually earned. (*Id.,* at pp. 818-821.)[19] In such a proceeding, all factors are held constant except the specific items under review—here gas supply costs and the investment credit. The prior rate of return was presumed to be reasonable. Whether in fact the utility was actually earning its authorized rate was germane to neither issue under review in the offset proceeding. Only in the general rate case, where all factors contributing to SoCal's operations were under review, was it necessary to consider whether the rates set afforded SoCal a reasonable opportunity to earn its authorized rate of return, and the commission did so. (*Southern California Gas Company* (1976) 80 Cal. P.U.C. 636.)

The decisions of the commission are affirmed.

Tobriner, J., Mosk, J., Manuel, J., and Jefferson, J.,* concurred.

[19]"First . . . [the utility] was not entitled to earn a profit on its expenses. Second, even its lawful profit was not guaranteed. A utility is entitled only to the *opportunity* to earn a reasonable return on its investment; the law does not insure that it will in fact earn the particular rate of return authorized by the commission, or indeed that it will earn any net revenues. [Citations.]" (*Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d at p. 821, fn. 8, original italics.)

*Assigned by the Chairperson of the Judicial Council.

**CLARK, J.,** Concurring and Dissenting.—I concur in the majority's holding that the Public Utilities Commission could reasonably conclude that SoCal's election of ratable flow-through—rather than immediate flow-through—of the tax benefits had collateral benefits warranting an appropriate rate of return adjustment. However, the adjustment made was inappropriate.

The commission's finding of collateral benefits, according to Decision No. 86117 denying rehearing, was predicated upon testimony that " 'SoCal's cash flow would be maximized, its interest coverage increased,[10] and the financial requirements in constructing facilities and acquiring gas supplies relieved. [Citation.] Each of these benefits reduces SoCal's risk.' " (*Ante,* p. 481.)

It is obvious that before any collateral benefit may be obtained, the utility must actually receive some additional funds. Otherwise, cash flow cannot be increased, interest coverage cannot be increased, and the financial requirements cannot be relieved.

As the majority point out, choice of immediate flow-through rather than ratable flow-through would result in a reduction of SoCal's revenue requirement of $4.4 million for 1975. (*Ante,* p. 478.) On the basis of the collateral benefits assertedly flowing to SoCal from ratable flow-through, the commission reduced SoCal's rate of return on its $824.5 million rate base by .25 percent: 8.5 percent to 8.25 percent. This results in a reduction in the revenue requirement after application of the net to gross multiplier of $4.4 million.

Thus, the use of ratable flow-through would result in an increase of $4.4 million in the revenue requirement over the use of immediate flow-through. But the use of ratable flow-through also requires, according to the commission, a reduction in the rate of return, and that reduction —translated to dollars—equals $4.4 million. Second grade arithmetic teaches that the two adjustments cancel each other. Rates are fixed on the basis of revenue requirement and will be the same whether using immediate or ratable flow-through.

---

"10'Interest coverage' expresses a relationship between the amount of return devoted to debt capital costs, as opposed to the amount available to equity investors, and the rate of return as a whole. It is usually used to express the ratio between rate of return and allowance for debt cost (interest). Interest coverage is a major indicator considered by securities analysts and bond rating services."

Similarly when we compare the utility's position without the investment tax credit and rate of return reduction with the utility's position in light of the commission's order, there is no substantial change and thus no benefit to the utility. The investment tax credit results in a tax savings to the utility (*ante,* p. 478) and the rate of return reduction results in a further tax savings (*ante,* p. 476, fn. 4). Those tax savings reduce the utility's expenses. The total of the tax savings or reduction in utility expense is approximately $4.4 million. The revenue requirement or anticipated income is also reduced approximately $4.4 million. Because expenses and income are reduced in the same amount, there is no net benefit to the utility.

When the revenue requirement is reduced by an amount equal to anticipated extra cash, extra cash does not exist, and it is patent cash flow is not increased, and financial requirements will not be relieved. Because the utility will receive exactly the amount of cash it would have received had it elected immediate flow-through, there are no benefits—collateral or otherwise—flowing to it from its election of ratable flow-through. The two adjustments cancelling each other, SoCal has ended up with the cash flow, interest coverage, and financial requirements which according to commission determinations warrant an 8.5 percent rate of return. But the commission is only allowing an 8.25 percent rate of return. Absent some extra cash received or kept by the utility, there is no benefit to justify reduction in the rate of return.[1]

The reduction in rate of return is predicated upon the conclusion that there would be in fact some benefit to the utility. Because the reduction in the permitted rate of return is so large as to itself preclude any benefit, it cannot be upheld.

Moreover, from an investment standpoint, whether debt or equity, there is actually a detriment rather than benefit flowing from the determination to choose ratable flow-through. While the cash flow remains constant in the current year, the investor is aware that the utility in future years will have to bear the burden of ratable flow-through, a future reduction in rates as the investment tax credit is flowed through in later years. There can be no justification for concluding that the utility's choice has reduced risk warranting .25 percent reduction in the rate of return. Instead the commission has stopped any benefit from flowing to the utility and has increased its risk.

---

[1]Although the instant decision involves a refund rather than initial fixing of rates, the basis of the refund order is that the rates as set allowed too great a rate of return.

For the foregoing reasons, the commission's decisions should be annulled.

While the foregoing should dispose of the case before us, I must take issue with the majority's statement that the policy of the State of California—unless contrary to federal law—requires immediate flow-through to the ratepayers of the tax benefits resulting from accelerated depreciation and the investment tax credit. (*Ante,* p. 476.) In an inflationary period such policy is shortsighted, resulting in ratepayers paying less than their fair share of utility costs and ultimately endangering the utility system and economy of our state.

Few would dispute that the ratepayers should be required to pay rates sufficiently high to permit the utility to earn a fair return on its investment and to cover its expenses. (*City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798].) Plant and equipment must constantly be replaced if current levels of production are to be sustained. Included within the expenses used to set rates is an allowance for depreciation—an allowance designed to compensate the utility for plant and equipment wear and to provide funding for replacement.

In the current period of severe inflation, depreciation allowance will obviously not provide sufficient funds to replace wornout plants and equipment. The allowance is based on historical cost—partially on costs incurred 30 and 40 years earlier. Replacement of plant and equipment to truly maintain current levels of production may cost twice or three times actual allowance.

Because the cost of replacement exceeds allowance, the utility is forced to seek other sources of capital to maintain current production, and unless the supplemental source is generated internally, the utility is required to continually go deeper and deeper into debt.[2] And if the utility is required to continually enter capital markets to finance what should be considered current expense—replacement of worn-out plant and equipment—the result can only be that the market for California utilities' debt securities will become increasingly expensive or will close entirely. The problem quickly becomes acute when the utility must borrow not only to

---

[2]Although theoretically the utility might raise funds by issuing stock, few investors can be expected to be interested in an enterprise which is unable to obtain a reasonable return on investment and other income sufficient to maintain its plant and equipment at current levels of production.

maintain current production but also to increase plant and equipment to meet the expanding needs of the California economy.[3]

Although the intent of Congress in originally providing for accelerated depreciation and the investment tax credit may have been to encourage investment generally thereby creating jobs, it is apparent that in our inflationary economy one function of those tax reduction provisions should be to help business replace worn-out plant and equipment—to make up part of the difference between the allowance for depreciation and the replacement cost of plant and equipment necessary to maintain current production. The accelerated depreciation and the investment tax credit are intended to reduce taxable income, taxable income is roughly equivalent to profit, and enterprises which cannot generate enough income to replace worn-out plant and equipment should not be considered profitable enterprises. The benefits of accelerated depreciation and the investment tax credit are tied to recent and current costs. Although the benefits also flow from investments made to increase productive capacity, it is apparent that replacement investment is necessary before there may be investment to increase productivity. Thus it is clear that one of the main functions of the tax savings should be to provide an internal source of replacement capital.

Once we recognize that in these inflationary times one of the main functions of accelerated depreciation and the investment tax credit is to permit the business enterprise to replace worn-out plant and equipment at current costs, it is apparent that the congressional tax policy and our commission regulatory policy are not in conflict. Establishment of rates sufficient to maintain adequate service is, of course, a crucial part of the commission's duties. (See, e.g., Pub. Util. Code, §§ 726-730.) Continuation of utility financial integrity must be viewed as a goal of both Congress and the commission.

Accelerated depreciation with normalization, and ratable flow-through of the investment tax credit, do not mean that ratepayers are deprived of the benefits of tax savings. Although normalization permits the utility to build up a capital account, the utility will not receive any return from such capital. Rather, ratepayers will ultimately benefit because the

---

[3]The problem of increasing expense of selling bonds for California utilities has already commenced. Pacific Telephone, for example, has had its bonds downgraded repeatedly in the last two years, receiving the lowest rating of any Bell system company. Last winter the downgrading of a $300 million bond issue meant that Pacific will have to pay $80 million additional interest over the 40-year life of the bonds. (*Southern Cal. Edison Co.* v. *Public Utilities Com.* (1978) 20 Cal.3d 813, 842 [744 Cal.Rptr. 905, 576 P.2d 945] (dis. opn.).)

reduction in need for capital will permit later rate reductions. Ratable rather than immediate flow-through of the investment tax credit merely delays the ratepayers' benefits. Moreover, even if benefits were not ultimately "flowed through" to the ratepayers, there is nothing unjust in requiring ratepayers to pay the replacement cost of worn-out plant and equipment, and accelerated depreciation and the investment tax credit would do no more than provide funds to make up part of the difference between the depreciation allowance based on historical cost and the current replacement cost.

I believe that neither we nor the commission should establish an inflexible state policy requiring immediate flow-through of tax savings by the ratepayers. Instead, policy should be flexible giving due regard to current ratepayers, future ratepayers, and the financial integrity of utilities. Fair consideration of those interests during periods of great inflation will often, if not customarily, counsel against immediate flow-through of tax benefits.

Richardson, J., concurred.

Petitioner's application for a rehearing was denied May 24, 1978, and the opinion was modified to read as printed above. Clark, J., and Richardson, J., were of the opinion that the application should be granted.