**STATE of Missouri ex rel. UTILITY CONSUMERS COUNCIL OF MISSOURI, INC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION of Missouri and Union Electric Co., Respondents.**

**No. WD 31071.**

Missouri Court of Appeals, Western District.

Sept. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1980.

Application to Transfer Denied Nov. 12, 1980.

Samuel H. Liberman, St. Louis, for petitioner–appellant.

Paul W. Phillips, Jefferson City, Stewart W. Smith, Jr., William E. Jaudes and Paul W. Agathen, St. Louis, for respondents.

Before WASSERSTROM, C. J., Presiding, and KENNEDY and PRITCHARD, JJ.

KENNEDY, Judge.

The sole issue in the present case is the propriety of the Public Service Commission's allowance in a rate case of deductions by Union Electric Company of "normalized" federal and state income taxes, as opposed to the smaller amount of income taxes actually paid during the test year, in arriving at cost of service. The test year ended June 30, 1977. The Commission allowed a $30,755,498 rate increase effective on February 2, 1978. The appellant Utility Consumers Council of Missouri, Inc., argues that the Commission improperly allowed the company to treat $24,510,500 in "normalized" or "deferred" federal and state income taxes, and not actually paid out during the test year, as expenses in computing the cost of service.

The difference between the amount of "normalized" taxes allowed by the Commission and the amount of taxes actually paid out by the utility arises from the difference in the accounting treatment of certain items for rate–making purposes on the one hand and for income tax purposes on the other. Those items are: accelerated depreciation, investment tax credit, and certain construction expenses.

*Scope of review.*

 Before we take up the arguments of the parties, we first take up the matter of the scope of our review. Sec. 386.510, RSMo 1978, says that we review the order or decision of the Commission for "reasonableness and lawfulness". It is really not our business here to weigh the arguments for the "normalization" method which the Commission has ordered, and the arguments for the "flow through" method for which the Utility Consumers Council contends, and to decide which preponderates. That is for the Commission. If the Commission's decision to allow the normalization method is not unlawful, if it is supported by reason, and is not arbitrary or capricious, then it is our task to affirm the Commission's decision. We do not substitute our judgment or our discretion for that of the Commission. The complaining party carries the burden of making a convincing showing that the Commission's order is not reasonable or lawful. *State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission*, 312 S.W.2d 791, 796 (Mo. banc 1958); *Empire Dist. Elec. Co. v. Cox*, 588 S.W.2d 263, 266 (Mo.App.1979); *State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216, 217 (Mo.App.1973); *State ex rel. Cape Girardeau v. PSC*, 567 S.W.2d 450, 454 n.4 (Mo.App.1978).

We now take up in order the arguments of the parties:

*Accelerated depreciation.*

For income tax purposes, the Internal Revenue Code allows the use of accelerated depreciation, resulting in larger annual deductions in the early years of the life of a depreciable asset and smaller deductions in later years. For rate–making purposes, a depreciable asset is presumed to depreciate at a constant rate, and the cost basis is deducted ratably over the life of the asset. Respondent's brief furnishes the following comparison of the results of the straight line method (the method used for rate–making purposes) and a form of accelerated depreciation known as the sum–of–the–years digits method: For an asset costing $1,000,000, with an estimated useful life of 10 years, the straight line depreciation deduction would be $100,000 per year over the life of the asset. This is the method used for rate ·making calculations. By the sum—

of–the–years digits method, used by the company for income tax purposes, the first year depreciation would be $181,818. That amount would decrease each year until in the tenth year the final depreciation deduction would be $18,181.

There is no disagreement about the use of the straight line method to arrive at the correct deduction for rate–making purposes. The dispute is over the treatment of the income tax "saving", actually a deferral, resulting from the use of the accelerated depreciation method.

By "normalization", which was allowed in the present case, the income tax expense item allowed to be deducted in arriving at cost of service are not the taxes *actually paid*, but are the amount which *would have been paid* had the straight line depreciation method been used in figuring the income taxes. For the test year now under examination, the accelerated depreciation method resulted in an income tax deferral of $5,474,678 over the amount which the straight line depreciation method would have produced. This deferred amount was credited to a "deferred tax" reserve. In later years, when the depreciation deduction is less than the straight line method would yield, and the resulting taxes more than the straight line method would have produced, the excess tax will be deducted from the reserve. Over the life of the asset, assuming constant tax rates, the total depreciation deduction and the total income tax reduction resulting therefrom, will be the same by either method. By the accelerated depreciation method, the depreciation deduction will be more in the early years and the income tax less, and the situation will be reversed in later years.

The Utility Consumers Council's criticism of the Commission's decision is that the deferred taxes which are allowed by the Commission's order to be charged to the ratepayers are actually a fictitious expense. To quote from appellant's brief, their position is as follows: "The income taxes paid by the company to the federal or state government in one year, should appropriately be charged to the customers buying company service in that year . . . 'Deferred' taxes are not expenses at all, but, at best, estimates of future taxes, which are charged to current ratepayers . . . Moreover, the whole idea of deferring expenses so as to 'even them out' over long periods of time, is at odds with the basic system employed by the PSC to set rates. The idea of applying test year information to a rate–making formula is to try to base rates on actual costs of service at a particular moment."

The "deferred tax reserve", to which the deferred amounts are credited, is an unfunded reserve. It creates, while it is in existence, a cost-free addition to capital. The appellant says that this is an interest–free loan from the *ratepayers* to the utility, for the ratepayers have paid it in and the utility does not pay it out. The Commission and the utility answer that the reserved amount is instead a loan from the United States Treasury to the utility. Whichever way one looks at it, it is a sum upon which the utility pays no interest. The amount of it is excluded from the rate base so the rates charged to the ratepayers do not include a return upon the reserved amount. The reserve therefore inures to the benefit of the ratepayers in that the rates do not reflect any cost for the use of the money. This feature provides an immediate benefit to the ratepayers.

Should normalization of taxes not be allowed, and "flow through" required, the substantial tax benefits of accelerated depreciation would be lost to the utility, Internal Revenue Code, §§ 167(*l*) and 46(f); *City of Akron v. Public Utilities Commission*, 51 Ohio St.2d 27, 364 N.E.2d 869 (1977). In the latter case, the court said: "Since the accounting procedure for normalization uses straight line depreciation which then creates a reserve for the tax obligation resulting from the tax deferral, the effect is that all of the rates and expenses stay the same in any event, but the utility loses the advantage of using the reserve fund as cost–free capital, which it would have if it uses both the accelerated depreciation method and normalization . . . Since we con-

clude that the Commission's inclusion in the ratemaking formula as an expense for the test year of the tax figure arrived at by normalizing tax liability computed by the accelerated depreciation method was neither unreasonable nor unlawful, and that under these facts the determination by the Commission concerning normalization is in the best interests of the ratepayers, the order of the Commission is affirmed." *Id.*, 364 N.E.2d at 870.

The normalization of taxes as ordered by the Commission in this case is widely accepted in rate cases. *See Fed. Power Commission v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973); *Cities of Lexington, etc. v. Federal Power Commission,* 295 F.2d 109, 111 (4th Cir. 1961); *Colorado Municipal League v. Public Utilities Commission,* 597 P.2d 586 (Colo. banc 1979); *City of Alton v. Illinois Commerce Commission,* 19 Ill.2d 76, 165 N.E.2d 513, 520 (1960); *New England Telephone & Telegraph Company v. Public Utilities Commission,* 390 A.2d 8 (Me.1978); *Re Hackensack Water Company,* 57 N.J.Super. 180, 154 A.2d 212, 219 (1959); *City of Akron v. Public Utilities Commission, supra. See also* Swiren, *Accelerated Depreciation Tax Benefits in Utility Rate Making,* 28 U. of Chicago L.Rev. 629 (1961). *See also* the following regulatory agency cases approving the normalization method: Re Hudson Water Company, 28 PUR 4th 617, 620 (N.H. Pub.Util.Comm.1979); Re Southwestern Public Service Company, 27 PUR 4th 302, 315 (N.M.Pub.Serv.Comm.1978); Re Kansas Power & Light Company, 20 PUR 4th 55, 59 (Kan.State Corp.Comm.1977); Re Mountain States Telephone & Telegraph Co., 22 PUR 4th 516, 538–40 (Col.Pub.Util.Comm.1977); Re East Ohio Gas Co., 16 PUR 4th 137, 151 (Ohio Pub.Util.Comm.1976); Re Arizona Public Service Company, 20 PUR 4th 253, 258–59 (Ariz.Corp.Comm.1977).

█ In contending for the "flow through" system of accounting, by which the income tax component is the amount of income tax actually paid out, the appellant says that the normalization method "is at odds with the basic system employed by the

PSC to set rates". It says that "(t)he idea of applying test year information to a rate-making formula is to try to base rates on actual costs of service at a particular moment." It cites in support of that proposition *State ex rel. Capital City Water Company v. Public Service Commission,* 252 S.W. 446, 448 (Mo. banc 1923), which held that past losses could not be capitalized and charged to present or future customers. They also cite *State ex rel. Valley Sewage Company v. Public Service Commission,* 515 S.W.2d 845, 851 (Mo.App.1974), and *State ex rel. Martigny Creek Sewer Company v. Public Service Commission,* 537 S.W.2d 388, 394 (Mo. banc 1976), both of which held that customers' contributions in aid of construction must be deducted from rate base. We have no quarrel with the cases cited by the appellant nor with the general proposition that present expenses are to be charged to present ratepayers. The latter proposition, though, is a very broad one and a very flexible one. It does not prevent the allowance by the Commission of the normalization method of computing the income tax component of the cost of service, if, as we have shown above, there are good reasons for it.

█ To counter the utility's position, adopted by the Commission, that denying normalization would result in a loss of the tax benefits of accelerated depreciation, appellant Utility Consumers Council attacks the validity of those sections of the Internal Revenue Code which purport to deny accelerated depreciation and investment tax benefits to those companies which do not "normalize" them but which flow them through to net income and hence to the ratepayer. *See* Internal Revenue Code, §§ 167(*1*) and 46(f). Appellant views these sections as *requiring* normalization by the Public Service Commission. Appellant then argues that this requirement is an unconstitutional intrusion by Congress upon state functions and violative of the Tenth Amendment to the United States Constitution. Leaving aside the effect of a pronouncement by this court in this proceeding, to which the federal government is not

a party, that these provisions of the Internal Revenue Code are unconstitutional and invalid, the answer to the appellant's contention is that its premise is incorrect. The cited sections of the Internal Revenue Code do not *require* normalization. The choice of normalization or "flow through" was open to the utility, in the first instance, and to the Commission. It might have rejected normalization and have foregone the tax benefit, if other considerations outweighed the tax advantages to be gained by normalization. Sec. 393.270.4, RSMo 1978. It chose, however, upon weighing the features of the two methods, to normalize. We find no constitutional infirmity in the Internal Revenue Code sections cited, and we reject the appellant's point.

*Investment tax credit.*

A regulated utility like other businesses is allowed an income tax credit of 11% of any amount invested in certain qualifying assets. In our case, only the portion above 4% (i. e., the additional amount authorized by the Tax Reduction Act of 1975) was normalized and is at issue here. The income tax credit amounted to $6,911,280. This credit was not "flowed through" to the ratepayers by adding it to net income for rate-making purposes. It was instead amortized over the life of the property to which it related. The credit was allowable only if normalized. It would have been disallowed if "flowed through". Internal Revenue Code, §§ 167(*l*) and 46(f).

Appellant correctly points out that the investment tax credit is an actual tax saving and not a tax deferral. In this respect it is unlike the accelerated depreciation, which results in a tax deferral rather than an outright saving.

Appellant fails to demonstrate how the decision of the Commission to normalize the investment tax credit costs the ratepayers, present or future, anything at all.

Appellant says: "A PSC order contradicting [the provisions requiring normalization in order to claim the investment tax credit] by denying normalization would, at worst, not change the rates, as the ratepayers would pay the same either way"–an argument which says that if the investment tax credit cannot be "flowed through" to the ratepayers, it should be foregone altogether! The ratepayers do, however, gain from normalization of the investment tax credit, as well as the accelerated depreciation and the construction expense deductions, the indirect benefit of an enhanced cash flow for the utility. It is difficult to see how the Commission could reasonably have denied normalization of the investment tax credit. It costs the utility customers nothing, but gives to the utility, to the indirect benefit of the customers, an improvement in cash position. *See Southern Cal. Gas Co. v. Public Utilities Com'n*, 23 Cal.3d 470, 153 Cal. Rptr. 10, 591 P.2d 34 (banc 1979).

*Construction expenses.*

There is a third category of expenses which are capitalized for rate-making purposes, but currently deducted from income for income tax purposes. These expenses are interest, property taxes, pensions and other costs charged to construction. They are not permitted, for rate-making purposes, to be "flowed through" to the ratepayer as incurred. Sec. 393.135, RSMo 1978, prohibits the company from earning any return upon facilities before they are actually placed in service. They are added to the cost of the production facilities, then amortized over the life of the facility, beginning when the facility is placed in service. These expenses, currently deducted for income tax purposes, result in a reduction of income taxes. By the tax normalization method, approved by the Commission's order in this case, the income tax saving resulting from the current deduction of these expenses is not "flowed through" at once to the ratepayers, but reduces the cost of the facility to which the expenses relate. Thus the income tax saving–for the test year $12,124,542- and the construction expenses to which they relate, are both amortized over the life of the facility, beginning with the time the facility is placed in service. There is logic and fairness in this method. The immediate flow–through

of income taxes saved, as the appellant would require, would result in a windfall to present ratepayers. Not having to pay the construction expenses, they would yet get the benefit of the income tax deduction resulting therefrom. Later ratepayers, while paying the expenses by way of depreciation, would not have the benefit of any tax deduction therefrom. *Cf. Memphis Light, Gas & Water Div. v. Fed. Power Com'n*, 500 F.2d 798, 806–7 (D.C.Cir.1974).

As in the case of tax savings from accelerated depreciation and from investment credit, normalization does provide for the ratepayers the indirect benefit of an enhanced cash flow for the utility.

*Conclusion.*

■ We conclude that the Commission's order approving normalization of income taxes in the three areas mentioned, i. e., accelerated depreciation, investment tax credit, and construction expenses, is supported by good and valid reasons. The appellant has not demonstrated either that they are unlawful or unreasonable. The least that can be said for the Commission's order is that it was within the zone of an allowable discretion, which is not to be disturbed upon judicial review. *Cf. Tenneco Oil Co. v. Federal Energy Regulatory Com'n*, 571 F.2d 834, 842–844 (5th Cir. 1978); *El Paso Natural Gas Co. v. Fed. Power Com'n*, 449 F.2d 1245 (5th Cir. 1971).

"It is obvious that we are confronted in this case with a problem in a special field which requires the exercise of expert skill that has been generally entrusted by state and federal legislation to administrative regulatory tribunals whose decisions, in the absence of abuse of discretion, should be followed by the courts." *Cities of Lexington, etc., Ky. v. Federal Power Commission, supra* at 114.

The judgment of the trial court is affirmed.

All concur.