STATE of Missouri ex rel. KCP & L GREATER MISSOURI OPERATIONS COMPANY, AG Processing, Inc., and Office of the Public Counsel, Appellants,

v.

MISSOURI PUBLIC SERVICE COMMISSION and Dogwood Energy, LLC, Respondents.

Nos. WD 75038, WD 75057, WD 75058.

Missouri Court of Appeals,
Western District.

May 14, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 25, 2013.

Application for Transfer Denied Oct. 1, 2013.

Karl Zobrist, Lisa A. Gilbreath, Wade Carr, and Roger W. Steiner, Kansas City, MO, Attorneys for Appellant KCP & L Greater Missouri Operations Company.

Jeremiah D. Finnegan and Stuart W. Conrad, Kansas City, MO, Attorneys for AG Processing, Inc.

Lewis R. Mills, Jr., Public Counsel, Jefferson City, MO, Attorney for Appellant, Office of the Public Counsel.

Jennifer Heintz, Jefferson City, MO, Attorney for Respondent, Public Service Commission.

Carl J. Lumley and Leland B. Curtis, St. Louis, MO, Attorneys for Respondent Dogwood Energy, LLC.

Before Division I: MARK D. PFEIFFER, Presiding Judge, and VICTOR C. HOWARD and ALOK AHUJA, Judges.

MARK D. PFEIFFER, Presiding Judge.

This appeal challenges the Public Service Commission's ("PSC") May 4, 2011 Report and Order, as clarified and modified by Order issued May 27, 2011, that ordered KCP & L Greater Missouri Oper- ations Company ("KCP & L–GMO") to file tariffs comporting with the PSC's findings in that Report and Order and Order of Clarification and Modification. Three parties to the proceedings before the PSC appeal: KCP & L–GMO, AG Processing, Inc. ("AGP"), and the Office of the Public Counsel ("OPC"). Dogwood Energy, LLC, was allowed to intervene and participate as a party respondent in this appeal.

**Factual and Procedural Background** [1]

The PSC is a state agency established by the Missouri legislature to regulate public utilities operating within the state. KCP & L–GMO is an electrical corporation within the meaning of section 386.020(15), and a public utility within the meaning of section 386.020(43), subject to the jurisdiction, control, and regulation of the PSC.[2] KCP & L–GMO was formerly known as Aquila, Inc. ("Aquila"). It changed its name after being acquired in 2008 by Great Plains Energy, Inc. ("GPE"), the parent of Kansas City Power & Light Company. KCP & L–GMO's service area is divided into two separate rate districts, referred to as MPS and L & P. The MPS rate district includes parts of Kansas City, Lee's Summit, Sedalia, Warrensburg, and surrounding areas. The L & P rate district is in and around St. Joseph, Missouri. To serve its customers, KCP & L–GMO owns generating capacity and also purchases power.

KCP & L–GMO initiated this case on June 4, 2010, by filing proposed tariff sheets with the PSC. The tariffs were designed to implement a general rate increase for electrical service in KCP & L–GMO's Missouri service area. KCP & L–

---

1. We view the facts together with all reasonable supporting inferences in the light most favorable to the PSC's order. *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 735 (Mo. banc 2003).

2. All statutory citations are to the Revised Statutes of Missouri, as updated though the 2011 Cumulative Supplement, unless otherwise indicated.

GMO's proposed tariffs were designed to recover an additional $75.8 million per year in rate revenues from its customers in the MPS rate district, and an additional $22.1 million per year in rate revenues from its customers in the L & P rate district. The tariff sheets proposed an effective date of May 4, 2011, but KCP & L–GMO voluntarily extended the tariff effective date until June 4, 2011. Notice of the filing of the proposed tariffs was issued by the PSC on June 22, 2010. The PSC allowed AGP, Dogwood, and nineteen others to intervene in the matter. AGP is an agricultural cooperative that operates a major soybean processing facility in St. Joseph, Missouri, and is among the largest electrical customers of KCP & L–GMO in the L & P rate district. Dogwood is both a retail power customer of KCP & L–GMO and a wholesale power supplier to KCP & L–GMO.

Subsequently, the PSC held local public hearings in six cities. The main evidentiary hearing in this matter was held from January 14 through February 4 and February 14 through February 17, 2011. A true-up hearing was held on March 3–4, 2011.

The PSC's Report and Order rejecting the tariffs was issued on May 4, 2011. It required KCP & L–GMO to file tariffs in compliance with the Report and Order by May 12, 2011, which KCP & L–GMO did. Staff requested changes to the fuel adjustment clause ("FAC") sheets, and KCP & L–GMO filed revised and substituted tariff sheets on May 16 and 17. On May 16, 2011, KCP & L–GMO filed its request to shorten the effective date of the compliance tariffs to June 4, 2011, which the PSC granted.

On May 26, 2011, the PSC held an on-the-record argument of the points raised in multiple applications for rehearing, motions for clarification, and objections to the tariff sheet submissions. The next day, the PSC issued its May 27, 2011 Order of Clarification and Modification, with an effective date of June 3, 2011. The Order rejected certain proposed tariff sheets and ordered KCP & L–GMO to file new tariff sheets to comply with the PSC's clarifications and modifications. The PSC set a deadline of June 2, 2011, for parties to file objections to the revised tariffs to allow them to go into effect on June 4, 2011. The PSC found good cause to grant expedited treatment of all but certain portions of KCP & L–GMO's compliance tariffs to become effective on less than thirty days' notice under section 393.140(11). The May 27 Order also extended the effective date of the FAC tariffs to July 2, 2011.

On May 31, 2011, KCP & L–GMO filed revised compliance tariffs to become effective on June 4, 2011, and FAC compliance tariffs to become effective on July 1, 2011. On June 1, 2011, KCP & L–GMO filed substitute tariff sheets with an effective date of June 4, 2011. The OPC objected to the compliance tariffs on June 1 and June 2. In response to the objections to the revised compliance tariffs, the PSC ordered that the compliance tariffs be suspended until June 18, 2011. The PSC set a deadline of June 8 for any additional objections to be filed. The OPC filed further objections and responses to KCP & L–GMO's arguments on June 8, 2011. The PSC found good cause to allow the tariffs to go into effect on less than thirty days' notice, and ordered the May 31 compliance tariffs to go into effect on June 25, 2011, and the May 31, 2011 FAC compliance tariffs to go into effect on July 2, 2011. The PSC had rejected KCP & L–GMO's request of a $97.9 million rate increase in favor of a $59.4 million rate increase, allocating $30,142,949 to the MPS rate district and $29,293,182 to the L & P rate district.

Petitions for review were filed in the Circuit Court of Cole County on June 24, 2011, by KCP & L–GMO; on June 30, 2011, by AGP; and on July 19, 2011, by the OPC. These matters were consolidated. The circuit court granted Dogwood's motions to intervene in the consolidated cases. On February 16, 2012, the circuit court issued its Judgment, finding that the PSC's Report and Order was both lawful and reasonable, and affirming the Report and Order in all respects.

KCP & L–GMO, AGP, and the OPC each filed a separate notice of appeal from the circuit court. The appeals were ordered consolidated, and Dogwood's motion to intervene as a respondent was sustained. Further details regarding the relevant disputed issues will be presented as applicable in the analysis section following.

**Standard of Review**

■ On appeal, we review the decision of the PSC rather than that of the circuit court. *State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. banc 2011). "Under section 386.510, the appellate standard of review of a PSC order is two-pronged: first, the reviewing court must determine whether the PSC's order is lawful; and second, the court must determine whether the order is reasonable." *Id.* (internal quotation omitted). The PSC's order is *prima facie* lawful and reasonable. § 386.270. The burden of proof is upon the party attacking the order to show by clear and satisfactory evidence that the order or determination of the PSC is unlawful or unreasonable. § 386.430.

■ "The lawfulness of an order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed de novo." *Praxair, Inc.*, 344 S.W.3d at 184 (internal quotation omitted).

■ "The decision of the [PSC] is reasonable where the order is supported by substantial, competent evidence on the whole record[,] the decision is not arbitrary or capricious or where the [PSC] has not abused its discretion." *Id.* (internal quotation omitted).

■ The PSC is required to make and file written findings of fact "upon all matters concerning which evidence shall have been introduced before it *which in its judgment have bearing on the value of the property*" of the electrical corporation affected. § 393.230.2 (emphasis added). "The [PSC's] factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, [we are] bound by the findings of the administrative tribunal." *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 735 (Mo. banc 2003) (internal quotation omitted).

**Mootness**

On February 27, 2012, KCP & L–GMO again filed tariffs seeking revenue increases for its MPS and L & P rate districts. At oral argument, the parties conceded that the tariffs that are the subject of this appeal have been superseded by tariffs approved by the PSC in a Report and Order with an issue and effective date of January 9, 2013.[3] Certain of the issues

---

**3.** Though all parties were aware of the January 9, 2013 Report and Order and were equally aware of the principle of law that a tariff superseded by a subsequent tariff generally renders the superseded tariff moot, the 2013 Report and Order was not brought to this Court's attention until February 27, 2013—two days before oral argument—and only then by one party for the purpose of supporting its argument as to the Accumulated Deferred Income Tax issue and not as a means of notifying this Court of the mootness issue. Not only would this Court have appreciated a much earlier notification of the 2013

addressed in the January 9, 2013 Report and Order, which is now on appeal before this court, had also been ruled upon in the May 4, 2011 Report and Order, which is the subject of this appeal.

■ In light of this intervening event, we must first decide whether we should dismiss this appeal in its entirety or in part because the issues are moot. "A threshold question in any appellate review of a controversy is the mootness of the controversy." *State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n*, 328 S.W.3d 329, 333–34 (Mo.App. W.D.2010) (internal quotation omitted). An issue or a case is moot when "intervening events make a decision unnecessary[,] and it is impossible for this [c]ourt to grant effectual relief"; that is, when "the question presented for decision seeks a judgment upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy." *Id.* at 333–34 (internal quotation omitted).

■ "When tariffs are superseded by subsequent tariffs that are filed and approved, the superseded tariffs are generally considered moot and therefore not subject to consideration because superseded tariffs cannot be corrected retroactively." *Id.* at 334 (internal quotation omitted). However, the parties have requested that we exercise our discretion to invoke an exception to the mootness doctrine and review the issues in this case. We have recognized that " '[i]t is not unusual in public-utility rate cases for new tariffs to overtake proceedings involving old tariffs.' " *Id.* at 334 (quoting *State ex rel. City of Joplin v. Pub. Serv. Comm'n*, 186 S.W.3d 290, 296 (Mo.App. W.D.2005)). "Invocation of [an] exception to the mootness doctrine is within this [c]ourt's discre-

tion when it is demonstrated that the case in question presents an issue that[:] (1) is of general public interest; (2) will recur; and (3) will evade appellate review in future live controversies." *Id.* at 334–35.

■ Certain of the issues in this case are currently pending appellate review in a present live controversy or are fact specific and have been superseded by new or additional facts evaluated by the PSC in the January 9, 2013 Report and Order. We thus believe not only that those issues are moot, but that they also fail to fall within the exception to the mootness doctrine justifying the exercise of our discretion to examine those issues: the OPC's point alleging unlawfully approved tariff sheets with an effective date less than the statutorily prescribed length of time; KCP & L-GMO's Point I regarding the valuation of Crossroads Energy Center; and KCP & L-GMO's Point III regarding the PSC's calculation of Crossroads' Accumulated Deferred Income Tax. Other issues in this case involve whether the PSC lawfully exercised its authority. These are legal issues of general public interest, the issues are recurring in nature, and these issues are susceptible to evading appellate review; thus, we elect to exercise our discretion under the exception to the mootness doctrine to examine the following issues in this case: KCP & L-GMO's Point II regarding the PSC's disallowance of transmission costs from recovery in rates and AGP's points relating to the difference between the PSC's rates and allocations and those requested by the utility.

## Analysis

### KCP & L–GMO's Appeal

The three issues raised by KCP & L-GMO in its appeal all relate to the deter-

---

Report and Order, we will expect more timely candor in future appeals that will inevitably be filed in other rate cases, some of which may include some or all of the same parties to this appeal.

minations made by the PSC with regard to Crossroads Energy Center ("Crossroads"). KCP & L–GMO sought recovery of costs associated with adding Crossroads to the MPS energy generation fleet.

## Background

Located in Clarksdale, Mississippi, Crossroads is a 300 megawatt ("MW") simple-cycle electric generation peaking plant that consists of four natural gas-fired combustion turbines. Aquila Merchant purchased eighteen 75 MW combustion turbines and used four of them at Crossroads and installed ten of them at its two Illinois energy centers. Aquila Merchant sold both of its Illinois energy centers to Union Electric Company, d/b/a AmerenUE, at substantially below book value in 2006.

Aquila relied exclusively on purchased power to meet its retail customers' demands for electricity until it built South Harper, a regulated generating unit, in 2005 in Peculiar, Missouri. Because KCP & L–GMO decided to install only three instead of five combustion turbines at the regulated generating unit, KCP & L–GMO had to satisfy the remainder of its capacity needs by purchasing power. KCP & L–GMO determined that Crossroads was the lowest cost option for meeting its purchased power requirements.

In February 2007, GPE announced that it was seeking to acquire the Missouri regulated electric operations of Aquila, KCP & L–GMO's predecessor, and Crossroads. In 2008, after GPE acquired Aquila, the Crossroads unit was transferred to the regulated books of KCP & L–GMO.

## Valuation of Crossroads

In its first point, KCP & L–GMO asserts that the PSC's Order is unlawful and unreasonable because the PSC erred in valuing Crossroads at $61.8 million.

Given the fact-specific nature of this rate issue that has been superseded by a subsequent rate order involving additional facts not present in the record relating to the current proceeding, KCP & L–GMO's Point I is denied, as the issue on appeal is moot.

## Disallowance of Transmission Costs

 In its second point, KCP & L–GMO argues that the PSC erred in disallowing transmission costs associated with delivering power from Crossroads to KCP & L–GMO's customers in Missouri from recovery in rates. KCP & L–GMO contends that the PSC's findings of fact and conclusions of law on this issue are insufficient, that the disallowance was logically inconsistent with its conclusion that Crossroads was the prudent choice because it was the overall lowest cost option, and that the disallowance unlawfully "traps" transmission costs incurred under a federally approved rate in violation of the filed rate doctrine and the Supremacy Clause.

### Sufficiency of Findings of Fact

 KCP & L–GMO asserts that the PSC's findings of fact and conclusions of law on the transmission cost issue are conclusory and do not explain the PSC's rationale for disallowing the transmission costs. Part of Staff's argument for removing Crossroads from KCP & L–GMO's cost of service was the cost of transmission to move energy from Crossroads in Mississippi to KCP & L–GMO's service territory in Missouri. KCP & L–GMO argued that the cost of transmission was offset by the lower gas reservation costs. Whenever an investigation is made by the PSC, section 386.420.2 requires it to "make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order or requirement in the premises." The PSC is

to avoid making findings of fact that are completely conclusory. *State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 28 (Mo.App. W.D.2010). "Section 386.420 does not define what constitutes adequate findings of fact, but Missouri courts have filled this gap by applying [section] 536.090, RSMo 2000, from the state's administrative procedures statutes." *Id.* Section 536.090 provides that "[t]he findings of fact shall be stated separately from the conclusions of law and shall include a concise statement of the findings on which the agency bases its order."

 "Whether or not the commission made adequate findings of fact is an issue of law for our independent judgment." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 274 S.W.3d 569, 577 (Mo.App. W.D.2009). Our standard of review is flexible. *Id.* Findings are adequate if they are "sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence." *Id.* (internal quotation omitted). "Findings are inadequate if they cause us to speculate as to which part of the evidence the commission believed." *Id.*

We have no difficulty understanding the basis for the PSC's decision to disallow the excessive transmission costs from recovery in rates. Those findings include the following. The PSC found that the estimated monthly cost of transmission to move energy from Crossroads to customers served by MPS was $406,000, which is far greater than the transmission costs for power plants located in the MPS district. The PSC noted that while this higher transmission cost is ongoing and will be paid every year that Crossroads is operating to provide electricity to customers located in and around Kansas City, Missouri, KCP & L–GMO does not incur any transmission costs for its other production facilities located in the MPS district that provide service in the district. The PSC excluded the excessive transmission costs from recovery in rates because "[i]t is not just and reasonable to require ratepayers to pay for the added transmission costs of electricity generated so far away in a transmission constricted location."

### Logical Inconsistency

KCP & L–GMO argues that the PSC's disallowance of transmission costs associated with the delivery of power from Crossroads from KCP & L–GMO's rate base was logically inconsistent with its conclusion that Crossroads was the prudent choice because it was the overall lowest cost option. The PSC determined that KCP & L–GMO's decision to include Crossroads in KCP & L–GMO's generation fleet at an appropriate value was prudent—with the exception of the additional transmission expense. One of the benefits of Crossroads was that the natural gas shipped to Crossroads typically comes from a different supply region than natural gas shipped to KCP & L–GMO's generating station located in Peculiar, Missouri. Thus, with Crossroads in its portfolio, KCP & L–GMO could take advantage of short-term pricing disparities and generate electricity from a region with lower priced natural gas. However, the lower prices at Crossroads are offset by significantly higher electric transmission costs, estimated at $406,000 per month.

The PSC found that it would be unjust and unreasonable to require ratepayers to pay for the added transmission costs of electricity generated at Crossroads in a transmission constricted location in Mississippi. The ongoing transmission cost associated with Crossroads is a cost that KCP

& L–GMO does not incur for its generating station located in Peculiar, Missouri.

 The PSC has the duty to set rates that are "just and reasonable"; any unjust or unreasonable charge is prohibited. § 393.130.1. The PSC employs a "prudence" standard to determine whether a utility's costs meet this statutory requirement. *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n,* 954 S.W.2d 520, 528 (Mo.App. W.D.1997). If a utility's costs satisfy this standard, the utility is entitled to recover those costs from its customers. *Id.* The PSC has defined its prudence standard:

> [A] utility's costs are presumed to be prudently incurred.... However, the presumption does not survive a showing of inefficiency or improvidence.... [W]here some other participant in the proceeding creates a serious doubt as to the prudence of an expenditure, then the applicant has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent.

*Id.* (internal quotation omitted). In this case, Staff raised a serious doubt about the prudence of including the transmission costs. In fact, Staff argued that the cost of transmission to move energy from Crossroads in Mississippi to KCP & L–GMO's service territory justified, in part, removing Crossroads from KCP & L–GMO's cost of service entirely.

 In order to disallow a utility's recovery of costs from its ratepayers, the PSC must find both that "(1) the utility acted imprudently, [and] (2) such imprudence resulted in harm to the utility's ratepayers." *Id.* at 529. In its decision, the PSC explains how the presumption of prudence was overcome by the fact that the cost of transmission to move energy from Crossroads to customers served by MPS

was far greater than the transmission costs for power plants located in the MPS rate district. The PSC also determined that the estimated annual transmission cost of $406,000 per month would be an ongoing cost paid every year that Crossroads operates to provide electricity to customers located in and around Kansas City, Missouri. In contrast, KCP & L–GMO does not incur any transmission costs for its other production facilities located in its MPS rate district that are used to serve customers in that district. The PSC found that it would not be just and reasonable to require ratepayers to pay for the added transmission costs of the electricity generated at Crossroads. Because the PSC made the decision on the recoverability of transmission costs based on a prudency analysis that considered both the prudence of including the transmission costs and the resulting harm to the ratepayers if such costs were included, the PSC's decision denying recovery was lawful. We also conclude that the PSC's decision to deny KCP & L–GMO recovery of transmission costs was reasonable.

**FERC Preemption**

 As part of the transmission path to get power from the Crossroads plant in Mississippi to the Kansas City area, KCP & L–GMO takes transmission service from Entergy Services, Inc. ("Entergy"), an integrated energy company engaged primarily in electric power production and retail distribution operations.[4] Entergy's transmission service tariff is filed with and approved by the Federal Energy Regulatory Commission ("FERC"). The issue raised by KCP & L–GMO is whether the PSC's order disallowing the transmission cost component in KCP & L–GMO's rate improperly eliminates the tariff rate approved by FERC, thus "trapping" those

4. ENTERGY, *http://www.entergy.com/about_ entergy/*

costs in violation of the filed rate doctrine and the Supremacy Clause of the United States Constitution, Article VI, Clause 2. In other words, does the fact that Entergy's transmission service rate was filed with the FERC affect the PSC's authority to disallow KCP & L–GMO's transmission costs in setting KCP & L–GMO's tariff?

The federal preemption and filed rate doctrine invoked by KCP & L–GMO involves the relationship between the federal and state rate-setting authorities. FERC regulates the transmission and sale of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce; however, such regulation extends only to those matters that are not subject to regulation by the states. 16 USC § 824(a). "Because of the potential conflict between the federal and state rate-setting agencies, the 'filed rate doctrine' was developed as an outgrowth of straightforward principles of [f]ederal preemption and the Supremacy [C]lause." *Associated Natural Gas Co.*, 954 S.W.2d at 530 (citing *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)). The filed rate doctrine requires "that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Nantahala*, 476 U.S. at 962, 106 S.Ct. 2349. The filed rate doctrine prohibits a state regulatory commission from "trapping" FERC-approved costs by preventing a distributor from fully recovering those costs from its retail customers. *Id.* at 970, 106 S.Ct. 2349.

The PSC points out that its decision had nothing to do with whether the transmission rates charged by Entergy to transport power from Crossroads in Mississippi to Missouri are just and reasonable, and therefore does nothing to call a FERC-approved Entergy tariff into question. We agree.

What the PSC *did* decide was that it would be unjust and unreasonable *to allow* KCP & L–GMO to *both* reap the benefit of energy producing cost savings at Crossroads (due in part to short-term pricing disparities and utilization of regionally lower priced natural gas used in energy production) *and* to recover the otherwise unnecessary transmission costs of the energy from Mississippi to Missouri. In fact, Staff went so far as to argue that the otherwise unnecessary cost of energy transmission justified, in part, removing Crossroads from KCP & L–GMO's cost of service entirely (as Crossroads was *not* the only energy production option available to KCP & L–GMO to service the two relevant rate districts in Missouri). The PSC rejected Staff's recommendation regarding Crossroads and, instead, included Crossroads in KCP & L–GMO's rate base but disallowed the cost of energy transmission (from Mississippi to Missouri) from chargeable rate expenses.

In effect, the PSC relented and granted KCP & L–GMO its requested option of using a distant energy producing facility so that it could take advantage of revenue opportunities, but required KCP & L–GMO to bear the burden of getting that energy to Missouri since other Missouri energy production options in the relevant Missouri rate districts bore no transmission expense whatsoever. The PSC did *not* conclude that Entergy's transmission service rate was unreasonable; instead, the PSC concluded that it was unreasonable for KCP & L–GMO to pass through otherwise unnecessary transmission costs to ratepayers when KCP & L–GMO is the one that wanted to conduct energy speculation operations in a transmission constricted location hundreds of miles away

from the rate districts to be serviced. It was not the *amount* of Crossroads transmission costs that the PSC disallowed; it was the concept of requiring ratepayers to pay for any Crossroads transmission costs in the first place.

KCP & L–GMO relies on *Nantahala*, 476 U.S. 953, 106 S.Ct. 2349, in which the Supreme Court considered the preemptive effect of a FERC order that reallocated the respective shares of two affiliated companies' entitlement to low-cost energy. Under an agreement between the two affiliated companies, Nantahala, a public utility selling to both retail and wholesale customers in North Carolina, had been allocated 20% of the low-cost energy purchased from the Tennessee Valley Authority ("TVA"), while 80% was reserved for the affiliate whose only customer was their common parent company. *Id.* at 956, 106 S.Ct. 2349. FERC found that the agreement was unfair to Nantahala and ordered it to file a new wholesale rate schedule based on an entitlement to 22.5% of the low-cost energy purchased from TVA. *Id.* at 958, 106 S.Ct. 2349. Subsequently, in a retail rate proceeding, the North Carolina Regulatory Commission ("NCRC") reexamined the issue, pooled the various sources of power available to the affiliates, and then allocated the pooled power according to demand, which resulted in an allocation of energy that did not take into account FERC's allocation of that same energy. *Id.* at 960–61, 106 S.Ct. 2349. The Court held that the NCRC could not order Nantahala to calculate its rate based on a different allocation percentage than that ordered by FERC. *Id.* at 969, 106 S.Ct. 2349. The facts of this case and *Nantahala* are distinguishable. Here, there is no FERC-required allocation of power between affiliates that the PSC is disturbing and, likewise, no dueling allocation percentages advocated by the PSC in contradiction to a FERC allocation per-

centage. In short, the PSC's 2011 Report and Order does not conflict with any FERC orders and, as such, the *Nantahala* case is inapposite to the present appeal.

KCP & L–GMO also relies on *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 356, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988), in which the Mississippi Public Service Commission ("MPSC") granted an electric utility an increase in its retail rates to enable it to recover the cost of purchasing an allocation of nuclear plant power *mandated* by FERC. The Mississippi Supreme Court reversed the decision, holding that the MPSC exceeded its authority by adopting retail rates to pay nuclear power plant expenses without first determining that the expenses were prudently incurred and that such prudence inquiry would not violate the Supremacy Clause. *Id.* The Supreme Court held that FERC proceedings preempted the MPSC's inquiry into prudence of management decisions that led to construction and completion of the nuclear power plant. *Id.* at 370, 108 S.Ct. 2428. According to the Court, "States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair. FERC-mandated allocations of power are binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates." *Id.* at 371, 108 S.Ct. 2428. Again, the facts of this case and *Mississippi Power* are distinguishable, as FERC has not *ordered* KCP & L–GMO to purchase power from Crossroads to meet its energy supply needs in Missouri; furthermore, no FERC-approved cost allocations between affiliated energy companies have been subjected to reevaluation in this state ratemaking proceeding. Thus, the *Mississippi Power* is equally inapposite to this appeal.

More to the point of this rate case, the Missouri Supreme Court has stated that:

> [T]he statutory power and authority which the [PSC] has to pass on the reasonableness and lawfulness of rates and to determine and pass upon the question of what rates are necessary to permit a utility to earn a fair and reasonable return ... necessarily includes the power and authority to determine what items are properly includable in a utility's operating expenses and to determine and decide what treatment should be accorded such expense items.

*State ex rel. City of West Plains v. Pub. Serv. Comm'n*, 310 S.W.2d 925, 928 (Mo. banc 1958). For reasons previously identified herein, we find that the PSC's decision to disallow the transmission expense associated with bringing power from Crossroads to Missouri is lawful, reasonable, and supported by substantial and competent evidence in the record.

KCP & L–GMO's Point II is denied.

### Calculation of ADIT

In its third point, KCP & L–GMO asserts that the PSC erred in calculating the amount of Crossroads' Accumulated Deferred Income Tax ("ADIT").[5]

Given the fact-specific nature of this rate issue that has been superseded by a subsequent rate order involving additional facts not present in the record relating to the current proceeding, KCP & L–GMO's Point III is denied, as the issue on appeal is moot.

### AGP's Appeal

■ Both of AGP's points assert that the PSC erred in granting rate increases in excess of the amount requested by the utility. In considering AGP's challenge to the PSC's rates and allocations, we start from the premise that the rates are lawful and reasonable. *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 485, 492 (Mo.App. W.D.1998). *See* § 386.270. The burden of proof is on AGP to prove otherwise by clear and convincing evidence. § 386.430.

### Rate Increase

■ In its first point, AGP contends that the PSC erred by exceeding its statutory authority and violated due process in granting KCP & L–GMO a rate increase for the L & P service area of $7 million in excess of the $22.1 million annual rate increase sought in KCP & L–GMO's filed tariffs, contained in the public hearing notice, and on which both public and technical hearings were held.[6]

---

5. The income tax expense item deducted in arriving at cost of service is not the taxes KCP & L–GMO actually paid, but is the amount that the company would have paid had the straight line depreciation method been used in figuring its income tax. *State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n*, 606 S.W.2d 222, 224 (Mo.App. W.D. 1980). "The 'deferred tax reserve[,'] to which the deferred amounts are credited, is an unfunded reserve. It creates, while it is in existence, a cost-free addition to capital." *Id.* It is an amount upon which the utility pays no interest. *Id.* "The amount of [the deferred tax reserve] is excluded from the rate base so the rates charged to the ratepayers do not include a return upon the reserved amount." *Id.* "The reserve therefore inures to the benefit of the ratepayers in that the rates do not reflect any cost for the use of the money." *Id.*

6. As the factual summary indicates, the rates set by the PSC were not higher than KCP & L–GMO sought; in fact, the rates were lower than KCP & L–GMO originally proposed ($97.9 million requested; $59.4 million granted). The PSC decision with which AGP disagrees is the PSC's allocation of the costs of Iatan 2 between the MPS and L & P rate districts differently than that proposed by KCP & L–GMO.

When an electrical corporation files any schedule stating a new rate or charge, the PSC has the authority, *"upon reasonable notice,* to enter upon a hearing concerning the propriety of such rate." § 393.150.1 (emphasis added). " 'Due process requires notice and a hearing; moreover, the adequacy of the notice and the hearing must be evaluated in the context of the specific procedure at issue, in this case, an administrative proceeding.' " *Harter v. Mo. Pub. Serv. Comm'n,* 361 S.W.3d 52, 58 (Mo.App. W.D.2011) (quoting *State ex rel. Mo. Pipeline Co. v. Mo. Pub. Serv. Comm'n,* 307 S.W.3d 162, 174 (Mo.App. W.D.2009)). In an administrative proceeding:

[D]ue process is provided by affording parties the opportunity to be heard in a meaningful manner. The parties must have knowledge of the claims of his or her opponent, [and] have a full opportunity to be heard, and to defend, enforce and protect his or her rights.

*Id.* (quoting *Weinbaum v. Chick,* 223 S.W.3d 911, 913 (Mo.App. S.D.2007)).

Here, the PSC ordered KCP & L–GMO to provide an individual notice to each of its customers in its Missouri service areas of the public hearings scheduled on KCP & L–GMO's rate increase request. Included in the notice was the following information:

On June 4, 2010, KCP & L Greater Missouri Operations Company filed an electric rate case with the Missouri Public Service Commission seeking to increase annual electric operating revenues by approximately $75.8 million in its MPS service territory and approximately $22.1 million in its L & P territory.

If approved in full, a typical Missouri residential customer—one who uses a monthly average of 1130 kWh in the summer and 780 kWh in the winter—

would see a less than $15 per month increase in charges.

The notice also included the dates, times, and locations of the public hearings and invited members of the public to make their views on the request known to the PSC. After providing reasonable notice to interested persons, a full hearing on KCP & L–GMO's tariff request, and consideration of all relevant factors, the PSC entered its Report and Order. We conclude that the notice reasonably apprised ratepayers of the nature and the extent of the possibility of rate increases and the public hearings reasonably afforded ratepayers with the opportunity to be heard with regard to the proposed rate increases. Accordingly, the constitutional requirements of due process were satisfied in this case.

AGP also argues that the tariff filed by the utility with the PSC fixes the aggregate level of revenues in the case, and the PSC is without statutory authority to approve rates in excess of the utility's request. Because, as the factual summary indicates, the *aggregate* rates set by the PSC were *not* higher than KCP & L–GMO sought (in fact, the rates were *lower* than KCP & L–GMO originally proposed: $97.9 million requested; $59.4 million granted), AGP is, in essence, arguing that the PSC erred in adopting a different method of *allocating* the supply/costs of Iatan 2 between the MPS and L & P rate districts than that proposed by KCP & L–GMO. KCP & L–GMO proposed allocating 41 MW of Iatan 2 to the L & P service area, and the remaining 112 MW to the MPS service area; Staff recommended allocating 53 MW of Iatan 2 to the L & P rate jurisdiction and 100 MW to the MPS service area. Staff's recommendation would necessarily result in a higher percentage rate increase to L & P customers than that proposed by KCP & L–GMO in its overall *aggregate* rate increase request.

The cost allocation issue was analyzed by PSC Staff in the Cost of Service Report filed with the PSC on November 17, 2010, more than two months before the hearing, and was discussed in detail at the evidentiary hearing. In the Report and Order, the PSC made findings of fact as to why this allocation of Iatan 2 between MPS and L & P would be "just and reasonable and in the public interest." The PSC found that Staff's proposal more correctly matched the proper level of Iatan 2 costs to the customers who originally supported the Iatan plant facility and who needed replacement of the base load purchased power capacity that had expired. The PSC determined that the L & P service area had more base load energy needs than MPS and, therefore, should be allocated more of Iatan 2. Furthermore, the PSC found that KCP & L–GMO's proposal would have the effect of widening the gap between KCP & L–GMO's retail rates for L & P and MPS, while Staff's proposal did not. As a result of this determination, which the PSC compares to a rate design[7] determination, the PSC allocated to the L & P base rate a larger portion of KCP & L–GMO's rate increase than proposed by KCP & L–GMO in its *aggregate* rate increase request. With this allocation, both L & P and MPS will receive some of the Iatan 2 base load capacity. In addition, the PSC recognized that although L & P customers receive a larger percentage increase in rates than proposed by KCP & L–GMO, they are currently paying significantly lower rates than MPS customers and will benefit long-term from the lower-cost generation.

■■■ The impact of the PSC's Order was *not* to grant KCP & L–GMO a greater *aggregate* rate increase than that requested; instead, the PSC's Order granted an *aggregate* rate increase that was $38.5 million *less* than KCP & L–GMO requested along with a corresponding *allocation* of that rate increase that was different than that requested by KCP & L–GMO. "[A] public utility may by filing schedules *suggest* to the [PSC] rates and classifications which it believes are just and reasonable, and, if the [PSC] accepts them, they are authorized rates[;] but the [PSC] alone can determine that question and make them a lawful charge." *May Dep't Stores Co. v. Union Elec. Light & Power Co.*, 341 Mo. 299, 107 S.W.2d 41, 50 (1937) (emphasis added). *See also State ex rel. Util. Consumers' Council of Mo., Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41, 56 (Mo. banc 1979).

■■■ "If the PSC's decision is based on purely factual issues, we may not substitute our judgment for that of the PSC." *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 485, 491 (Mo.App. W.D.1998). The PSC had the discretion to allocate the cost of Iatan 2 between KCP & L–GMO's MPS and L & P rate districts in its rate design, and its cost allocation was reasonable and supported by the record. *See State ex rel. City of West Plains*, 310 S.W.2d at 933.

AGP's Point I is denied.[8]

7. " 'Rate design' is the method used to determine the rates to be charged to individual classes of customers." *State ex rel. Monsanto Co. v. Pub. Serv. Comm'n*, 716 S.W.2d 791, 791 (Mo. banc 1986).

8. AGP similarly argues that in granting the rate increases in this case, the PSC was unlawfully substituting its judgment for that of the utility's management and attempts to sup-

port this assertion by relying on *State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 416 S.W.2d 109, 113 (Mo. banc 1967). However, the *Southwestern Bell* case is inapposite. In that case, the PSC ordered Southwestern Bell to provide service to an area where the company had not offered service. *Id.* The court held that, notwithstanding that Southwestern Bell was "em-

### Phase–In

In its second point, AGP restates its first point of error and further asserts that the PSC erred in ordering the phase-in of a rate increase for the L & P service area in excess of the amount the utility sought in its filed tariffs. AGP argues that section 393.155.1, the "phase-in statute," limits the amount to be phased in to the amount requested by the utility. Based upon our resolution of AGP's first point, we find no support for AGP's argument that the rate set by the PSC is limited to the amount requested by the utility.

Before this rate case, KCP & L–GMO's rate base was $190,457,404. As a result of this case, KCP & L–GMO's rate base is $422,039,507. This "unusually large increase" in KCP & L–GMO's rate base resulted from the inclusion of Iatan 2. The PSC allocated Iatan 2 between KCP & L–GMO's L & P and MPS service areas, with the L & P service area allocated a greater portion of the increase than KCP & L–GMO originally asked to be attributed to that service area. Thereafter, the PSC determined that a phase-in of the rate increase in the L & P service area was a just and reasonable method of implementing this large increase. The PSC concluded that rates for the L & P service area should initially be set at an amount equal to the $22.1 million originally proposed by KCP & L–GMO, with the remaining increase plus carrying costs phased-in in equal parts over a two-year period.

Under section 393.155.1, when, after hearing, the PSC determines that an electrical corporation should be allowed a total increase in revenue that is primarily due to an unusually large increase in the corporation's base rate, the PSC is permitted to phase-in that unusually large increase in base rate over a reasonable number of years. "Any such phase-in shall allow the electrical corporation to recover the revenue which would have been allowed in the absence of a phase-in and shall make a just and reasonable adjustment thereto to reflect the fact that recovery of a part of such revenue is deferred to future years." § 393.155.1. The statute further provides that the PSC may, in its discretion, implement the phase-in by approving tariff schedules that take effect from time to time after the phase-in is initially approved. *Id.* The statute is applicable to this case, where KCP & L–GMO's rate base changed significantly due to the addition of Iatan 2 to its rate base. The PSC's decision to allow a phased-in increase due to the addition of Iatan 2 to KCP & L–GMO's rate base is lawful under section 393.155.[9]

---

ploying its plant and equipment in a public service, they still remain its private property, and the public may not assume the role of general manager and require such property to be used in a service to which the owner has not voluntarily dedicated it." *Id.* In this case, KCP & L–GMO serves customers in both the L & P and MPS rate districts, and the issue decided by the PSC was the appropriate rate to be charged in KCP & L–GMO's existing service area. As our ruling today confirms, the PSC—not a utility company—is vested with the ultimate authority to set just and reasonable rates within the relevant rate districts. §§ 393.130, 393.140.

9. In its attempt to support its argument that the PSC does not have the authority to establish a phase-in that exceeds the amount the utility requested, AGP relies upon a 1974 Jackson County circuit court order (which was not appealed) interpreting the phase-in statutory framework in a manner consistent with AGP's argument on appeal. AGP asserts that this is the law in Missouri. We disagree. "[A] court's decision has stare decisis effect upon a lower court or one of the same rank but not upon a court higher in rank than the court in which the decision is cited as precedent." 20 AM. JUR. 2D *Courts* § 142 (2005).

Furthermore, the PSC's decision was reasonable to mitigate rate shock to customers in the L & P rate district. In fact, it should come as no surprise that the PSC would invoke a phase-in of the L & P territory rate increase. As was recounted in the PSC's Order of Clarification and Modification, it was AGP that "suggested as a possible solution that the rate increase for L & P customers be phased-in. This phase-in option was argued in-depth during the on-the-record session on May 26, 2011." On appeal, AGP now contends that the PSC erred in adopting *the approach that AGP suggested.* Under the invited error rule, a party cannot complain on appeal of an alleged error created by the party or in which the party joined or acquiesced. *See Tate v. Dep't of Soc. Servs.,* 18 S.W.3d 3, 7 (Mo.App. E.D.2000). Thus, though we find no error in the PSC's decision to phase-in the L & P rate increase, any argued error by AGP on this topic was invited by AGP below and is not properly argued as error before this court.

AGP's Point II is denied.

### OPC's Appeal

The OPC's point on appeal argues that the PSC unlawfully approved tariff sheets with an effective date less than the statutorily prescribed length of time.

We deny this point as moot. The tariff at issue in this proceeding has been superseded by a subsequently approved tariff in the previously mentioned January 2013 Report and Order. And, presently pending before this court is the OPC's Petition for Writ of Mandamus (Case No. WD76079) arising from the January 2013 Report and Order in which OPC has lodged the same general argument as it has presented on this appeal. On March 13, 2013, this court issued a preliminary writ of mandamus and directed the PSC to file a written answer to the OPC's Petition for Writ of Mandamus and for the parties to otherwise conform to a briefing schedule in accordance with the schedule set forth in Rule 84.24(i). These procedural details reflect that this issue, albeit one of general public interest and recurring in nature, is being addressed by appellate review in a presently pending live controversy. Thus, this issue does not fall within the exception to the mootness doctrine, and we decline to exercise discretion to examine this issue in the context of a mooted tariff case. The OPC's Point is denied, as the issue on appeal is moot.

### Conclusion

KCP & L–GMO's Point I and III and the OPC's point on appeal are denied as moot. In all other respects, the circuit court's judgment upholding the PSC's May 4, 2011 Report and Order, as clarified and modified by Order issued May 27, 2011, is affirmed.

VICTOR C. HOWARD, Judge, concurs.

ALOK AHUJA, Judge, concurs in part and dissents in part in separate opinion.

ALOK AHUJA, Judge.

I concur in the majority opinion to the extent it recognizes that all of the issues in this case are moot in light of the Public Service Commission's January 2013 approval of tariffs for KCP & L which supersede the tariffs at issue in this appeal. As the majority explains, because of the Commission's approval of the superseding tariffs, and because no party sought to stay the effectiveness of the tariffs authorized in 2011, this Court cannot provide the parties with any meaningful relief with respect to the 2011 order. Quite simply, the appeal is moot because a decision by this Court would have no real-world impact whatsoever.

I also concur in the majority opinion to the extent that it declines to address issues concerning the valuation of KCP & L's interest in the Crossroads generating facility, the proper treatment of KCP & L's accumulated deferred income tax ("ADIT") associated with the Crossroads facility, and the Commission's establishment of accelerated effective dates for certain of KCP & L's tariff filings.

I dissent, however, from the majority's decision to address the merits of the other issues raised by the parties, despite their acknowledged mootness. In my view, *none* of the issues presented in this moot appeal justify resolution, because those issues are fact- and record-specific, and do not present novel legal questions of relevance beyond the circumstances of this case; to the extent these issues will ever recur, they will arise on a different factual record, and will not evade appellate review in future proceedings.

At the outset, I emphasize that my disagreement with the majority opinion concerns only the procedural issue of the justiciability of this appeal; I do not disagree with the majority opinion's substantive resolution of the issues it decides. But for the mootness issue, I would fully concur in the majority opinion without hesitation.

## Analysis

As we explained in *Public Service Commission v. Missouri Gas Energy,* 388 S.W.3d 221 (Mo.App. W.D.2012), we will decide an issue presented on appeal, even if it is moot, "when it is demonstrated that the case in question presents an issue that (1) is of general public interest; (2) will recur; and (3) will evade appellate review in future live controversies." *Id.* at 229 (citations and internal quotation marks omitted). "We will exercise this discretionary jurisdiction if there is some legal principle at stake not previously ruled as

to which a judicial declaration can and should be made for future guidance." *Id.* (citations and internal quotation marks omitted). The issues presented in this appeal do not meet these standards.

1. Most of the issues the majority decides are dependent on the particular facts of, and record in, this case. Because the issues are so fact-specific, the majority opinion announces no "legal principle ... not previously ruled," and will not provide meaningful precedent for future cases; the issues are therefore not "of general public interest." *Id.*

For example, the PSC's decision to prohibit KCP & L from recovering the costs of transmission of electricity from the Crossroads facility, despite its determination that KCP & L's acquisition of an interest in Crossroads was otherwise prudent, is a highly fact-dependent question. Resolution of the question depends on, among other things: the distance between Crossroads and KCP & L's service area, and the transmission infrastructure available to transport electricity from one to the other; the amount of KCP & L's transmission costs; the difference between the cost of generating electricity in Mississippi and in Missouri (which may offset in whole or in part the increased transmission expense); KCP & L's cost to acquire its interest in the Crossroads facility; and the alternatives available to KCP & L to supply the same electricity needs.

The only *legal* principles at stake in connection with the transmission-cost issue are: that Commission decisions must be supported by sufficient competent evidence on the record as a whole; that the Commission must make sufficiently detailed factual findings to support its decisions and enable meaningful appellate review; and that the Commission must set utility rates at a level that is just and reasonable. But those are commonplace

legal principles, which we have recited in countless cases. Moreover, the majority opinion does not *announce* those principles; it merely *applies* them to the specific factual circumstances involved here. There is no pressing need for this Court to issue yet another decision applying these well-established principles.

The Commission's refusal to permit KCP & L to recover its interstate transmission costs, despite the fact that those costs are regulated by the Federal Energy Regulatory Commission ("FERC"), *does* present a purely legal issue, on which no Missouri caselaw currently exists. Even this issue does not require decision in this moot appeal, however. First, decision of the FERC preemption issue may be unnecessary, depending upon whether the Commission's decision to disallow recovery of transmission costs was supported by the record evidence. Moreover, as I explain below, the FERC preemption issue is very likely to arise again in a future, live controversy, in which it would not evade review.

AG Processing has attempted to characterize the issues it raises, concerning the rates set by the Commission for the L & P rate district, as issues of broad legal significance concerning the power of the Commission to establish rates higher than those requested by a utility. But the issue presented in this case is in fact far narrower. Ratepayers in the L & P district were notified of the aggregate rate increase KCP & L sought, as well as the portion of that rate increase KCP & L proposed to extract from L & P ratepayers. And, as the majority explains, the Commission's decision does not award KCP & L more than it asked for: to the contrary, the Commission awarded KCP & L a total rate increase far below the aggregate increase that it sought. The Commission did, however, re-allocate some of KCP & L's proposed rate increase to the L & P rate district, based on the Commission's determination that, on the facts of this case, L & P ratepayers should shoulder a greater share of the costs of the Iatan generating plant than KCP & L had proposed. This is, once again, a highly fact-specific issue. Moreover, given that KCP & L is now aware of the allocation of Iatan-related costs which the Commission deems appropriate, this issue (where KCP & L proposes one allocation of such costs, and the Commission adopts another) is unlikely to recur, even with respect to KCP & L.[1]

An additional factor counsels against deciding the transmission-cost issue here. The PSC has informed us that additional evidence related to the issue was presented to the Commission in the proceedings which resulted in the January 2013 Report and Order, and the 2013 order itself makes additional factual findings concerning the issue, beyond the findings contained in the 2011 order we review in this appeal. Although the transmission-cost issue raised in this appeal, and the issue that will be raised in the appeals of the 2013 order, may be similar, the resolution of the issue in the later appeal will necessarily depend on the evidence contained in the record of the proceedings which resulted in the 2013 order, and on the findings the Commission made in the 2013 order. Given a different record, and different findings, a decision

---

1. I also find it significant that the principal legal authority on which AG Processing relies is an unappealed 1974 decision of the Jackson County Circuit Court. It may be that AG Processing was unable to cite more recent authority, or authority from a higher court, because the approach the PSC has taken in this case is contrary to the accepted understanding of the law in the intervening thirty-nine years; but it seems just as likely that the issue is simply not recurrent, nor of general public interest.

concerning the transmission-cost issue in this moot appeal may be of only limited relevance to the resolution of the same or similar issues in the appeals of the 2013 order.

State ex rel. Missouri Public Service Co. v. Fraas, 627 S.W.2d 882 (Mo.App. W.D. 1981), is perhaps the leading case applying mootness principles to Commission proceedings. Fraas holds that it may be appropriate to decide questions which have been mooted by the Commission's adoption of superseding tariffs, where those questions present recurrent legal issues of general public interest. Id. at 885. Fraas emphasizes, however, that "[i]f the matter in dispute is simply a question of fact dependent upon the evidence in the particular case, there is no necessity for a declaration of legal principle such as to call the exception into play." Id. Fraas itself refused to decide a majority of the issues presented, finding that the issues were "peculiar to this case, with the ruling being confined to the particular facts here." Id. at 890; see also, e.g., State ex rel. Pub. Counsel v. Pub. Serv. Comm'n, 328 S.W.3d 347, 353 (Mo.App. W.D.2010). The same could be said in this case: the issues the majority decides are "question[s] of fact dependent upon the evidence in th[is] particular case," which have significance "confined to the particular facts here."[2] We should follow Fraas' lead, and refuse to consider any of the questions presented.

I recognize that in State ex rel. Praxair, Inc. v. Public Service Commission, 328 S.W.3d 329 (Mo.App. W.D.2010), we suggested that issues "regarding the cost at which retail electric services are provided to the public at large in certain portions of Missouri" were "inherently 'of general public interest'" within the meaning of the exception to the mootness doctrine. Id. at 335. Of course, the fact that issues raised in a utility ratemaking case may be of "general public interest" cannot alone justify deciding those issues in a moot case: the issues must also be recurrent, and it must be likely that the issues will evade appellate review in future proceedings, when they recur. But I also question whether the statement in Praxair can be taken literally: I fail to see how an issue decided in a prior ratemaking proceeding is of "general public interest" where the rates approved in that proceeding are no longer in effect, and where no relief is available with respect to the past period during which those rates were in effect. At that point, it seems to me, the issue is of only academic or historical interest, unless it presents a legal question on which a decision will have precedential value in future cases. Even if a particular issue may have been of "general public interest" when it actually affected the prices ratepayers paid, it ceases to be of "general public interest" when it has no real-world effects, without some indication that a decision of the issue will materially affect future proceedings.

2. Quite apart from the fact-specific nature of the issues presented here, decision of the issues is also unjustified because, to the extent similar issues recur in the future, those issues will not evade appellate review.

---

**2.** The highly fact-specific issues raised in this appeal can be contrasted with the stark legal issue presented in Missouri Gas Energy: "the ability of the Commission to allow a utility company to include an exculpatory clause in a tariff that immunizes the company from liability for any personal injury or property damage caused by the company's negligence occurring on the customer's property and gas utilization equipment." 388 S.W.3d at 229. Resolution of that legal issue, even in an appeal in which the issue was technically moot, could have far-reaching significance in future proceedings, including proceedings involving other utilities. The same cannot be said here.

Issues concerning the rates KCP & L may charge, and specifically how those rates should be influenced by KCP & L's acquisition of an interest in the Crossroads plant, are presented in multiple other appeals currently pending before this Court. Besides this appeal, some of the appellants have also appealed from the Commission's approval of the tariffs KCP & L submitted to comply with the 2011 order (No. WD75437); and multiple appeals have been filed from the Commission's January 2013 Report and Order concerning KCP & L's subsequent rate requests (Nos. WD76164, WD76166). A review of the 2013 Report and Order reflects that it decided issues concerning the valuation of the Crossroads facility, KCP & L's right to recover the costs of transmitting electricity from the Crossroads facility, and the appropriate amount of ADIT KCP & L could recognize, which are very similar to issues presented here. In addition, as the majority notes, the Office of Public Counsel has raised issues concerning the Commission's establishment of accelerated effective dates for compliance tariffs implementing the 2013 Report and Order in a petition for extraordinary writ (No. WD76079); this Court issued a preliminary writ of mandamus in that case on March 13, 2013, and set the matter for full briefing. There may well be other proceedings pending in this Court which concern the same underlying factual circumstances.

To the extent issues similar to those involved here are raised in any of these other proceedings, the issues will not evade appellate review in those other cases. In the mandamus proceeding, we have stayed the effectiveness of the challenged Commission order; issues concerning its validity will therefore not become moot. Moreover, the PSC orders which are challenged in the other appeals were issued after July 1, 2011. Those orders are accordingly subject to § 386.520.2, RSMo Cum.Supp.2012, which authorizes the Commission to adjust prospective rates where a judicial decision determines that the rates the Commission previously approved were unlawful or unreasonable. Therefore, it appears that, even if no party sought a stay of the Commission's later orders, and those orders were then superseded by yet further Commission orders, the issues would *not* be mooted, because a judicial decision concerning the lawfulness of the superseded tariffs could have real consequences in light of the rate-adjustment authority provided by § 386.520.2, RSMo Cum.Supp.2012. The fact that the issues will not evade review in future proceedings provides yet another reason for this Court to decline to address these issues now.[3]

**3.** In *Praxair*, we suggested that this Court was justified in considering moot questions where the same, or similar, issues were being raised in appeals challenging Commission orders approving subsequent tariffs. 328 S.W.3d at 335. But in *Praxair*, the Court was concerned that the issues presented would "continually evade review," as tariffs challenged in judicial review proceedings were repeatedly superseded by later tariffs. *Id.* By virtue of § 386.520.2, RSMo Cum.Supp.2012, that sort of infinite regress is no longer an issue. I recognize that some decisions have suggested that the prohibition on retroactive ratemaking, or the prohibition on adjusting future utility rates to reflect prior over- or under-collections, may have constitutional underpinnings. *See, e.g., State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 328 S.W.3d 347, 352 (Mo. App. W.D.2010) (quoting *Lightfoot v. City of Springfield*, 361 Mo. 659, 236 S.W.2d 348, 354 (1951)); *State ex rel. City of Joplin v. Pub. Serv. Comm'n*, 186 S.W.3d 290, 299 & n. 8 (Mo.App. W.D.2005). If that suggestion is accurate, there may be an argument that § 386.520.2, RSMo Cum.Supp.2012, is unconstitutional. Statutes are presumed to be constitutional until the contrary is shown, however, *see, e.g., Missouri Roundtable for Life, Inc. v. State*, 396 S.W.3d 348, 350–51 (Mo. banc 2013); I therefore disregard any

### Conclusion

This Court is not, and should not be, in the business of issuing advisory opinions which will have no immediate impact, and which will have no (or at best limited) precedential value in future cases. Our reluctance to decide moot questions should only be heightened when the issues presented are capable of being presented, and decided, in a future live controversy. Because I believe the majority opinion disregards these principles by deciding the merits of *any* of the issues presented in this appeal, I respectfully dissent in part.

potential constitutional infirmities of § 386.520.2 for present purposes.